# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2015-CA-00213-SCT

*RACHEL SMITH*

*v.*

*DAVID SMITH*

| | |
|---|---|
| DATE OF JUDGMENT: | 09/11/2014 |
| TRIAL JUDGE: | HON. SANFORD R. STECKLER |
| TRIAL COURT ATTORNEYS: | EARL L. DENHAM |
| | DEAN HOLLEMAN |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | AMANDA JANE PROCTOR |
| | WILLIAM R. WRIGHT |
| ATTORNEYS FOR APPELLEE: | DEAN HOLLEMAN |
| | PATRICK TAYLOR GUILD |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 10/13/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE RANDOLPH, P.J., COLEMAN AND MAXWELL, JJ.**

**MAXWELL, JUSTICE, FOR THE COURT:**

¶1.     When sexual-abuse allegations are raised in a child-custody case, a guardian ad litem

("GAL") must be appointed to represent the child's best interest.  Here, the appointed GAL

made visitation recommendations but was not asked to make a custody recommendation.

The chancellor addressed this issue on his own.  We find the fact the chancellor made an

independent custody assessment is not, itself, error.  Furthermore, after review, we find no

error in the chancellor's ultimate custody decision, evidentiary rulings, and award of costs

to the husband. We do, however, find the chancellor should have explained why he rejected the GAL's recommendation[1] that the minor children be assessed and counseled. But we find this omission was harmless error and does not require reversal. We affirm.[2]

**Background Facts and Procedural History**

### I. Custody & Guardian Ad Litem

¶2. Rachel and David married on March 13, 2004.[3] The couple had two children—a daughter, Samantha, and a son, Larry.[4] On August 8, 2011, at Rachel's request, the couple met with a counselor in Hattiesburg. During the meeting, Rachel accused David of molesting their daughter. The Harrison County Department of Human Services ("DHS") and the Biloxi Police Department investigated the alleged abuse. As part of the investigation, the South Central Mississippi Child Advocacy Center conducted a forensic interview of Samantha. During this interview, Samantha made no mention of abuse. And ultimately, neither DHS nor the Biloxi police sought criminal charges or youth-court action against David.

¶3. Still, Rachel filed her complaint for divorce from David on August 31, 2011, and she continued to claim he had sexually abused their daughter. The chancellor entered a temporary order on December 16, 2011, granting sole legal and physical custody to Rachel

---

[1] *J.P. v. S.V.B.*, 987 So. 2d 975, 982 (¶ 20) (Miss. 2008) (citing *S.N.C. v. J.R.D., Jr.*, 755 So. 2d 1077, 1082 (Miss. 2000)).

[2] *See* ***Borden v. Borden***, 167 So. 3d 238 (Miss. 2014).

[3] This is a confidential case, requiring fictitious names for the parties and their family members.

[4] Samantha was born on August 17, 2006. Larry was born on July 14, 2011.

and supervised visitation to David, and appointed a guardian ad litem. The court noted an order assigning the GAL's duties would follow. More than a year later, the chancellor entered a new temporary order, instructing the GAL to secure and/or coordinate with expert witnesses to assess the validity of Rachel's sexual-abuse allegations.

¶4.     The court appointed a forensic interviewer to conduct a second interview of Samantha. During this second interview, Samantha claimed David had "touched her private spots."[5]    David continued his supervised visitation with Samantha and Larry. And eventually, on June 10, 2013, the parties filed a consent decree to divorce on grounds of irreconcilable differences. Aside from the usual financial matters, the parties' consent decree asked the chancellor to decide: (1) custody of Samantha and Larry, (2) visitation, and (3) whether facts existed to require supervised visitation. At a December 4, 2013 hearing, the chancellor explained that he believed "suggestive techniques were involved in eliciting the statements from the child." He also felt Samantha had been "inadvertently or deliberately . . . clearly coached." During the same hearing, the chancellor expressed concerns about Rachel's stability, particularly that she admitted using Samantha as bait to try and catch David abusing her.[6]

¶5.     The chancellor found no validity to the abuse allegations. So he modified custody, giving Rachel and David temporary, joint legal custody of Samantha and Larry, with Rachel

---

[5] This interview took place January 24, 2013.

[6] The chancellor was troubled that, after believing David had sexually abused Samantha, Rachel still let David bathe her, placing hidden cameras in the bathroom to try to record the supposed molestations. Rachel produced no video or audio from these cameras.

having temporary, primary physical custody. Thus, David was no longer required to have supervised visitation.

¶6. Rachel's attorney asked the chancellor that, before he enter his final judgment, he instruct the GAL to file a written report—which she did on July 17, 2014. The report recounted interviews, the evidence presented at trial, and completed tasks. It also included the GAL's recommendations to the court. The GAL recommended David continue his unsupervised visitation with Samantha and Larry. She also recommended a neutral counselor be assigned to periodically assess the children. The GAL had not been requested to make a custody recommendation, nor did she make one.

¶7. The chancellor's final judgment awarded David primary physical and legal custody of Samantha, with a visitation schedule for Rachel. But it made no mention of the GAL's specific recommendation that the minor children receive counseling. On appeal, Rachel claims numerous deficiencies with the GAL's duties and report. She also takes issue with the chancellor's *Albright*[7] analysis.

## II. Evidence of Alleged Abuse

¶8. Rachel first raised the sexual abuse allegations in August 2011. Testimony supporting these allegations comes from four sources—(1) Rachel, (2) Rachel's mother, Paula, (3) a counselor named J. T. Rutland, and (4) the second forensic interview. But the chancellor was skeptical of much of the abuse testimony. The chancellor was particularly concerned with J. T. Rutland's involvement and testimony.

_____

[7] *Albright v. Albright*, 437 So. 2d 1003 (Miss. 1983).

¶9. When the chancellor initially granted David supervised visitation, he ordered Lighthouse Ministries serve as the location for supervised visits. And from December 2011 until December 2012, J. T. Rutland, a counselor with Lighthouse Ministries, supervised most visits. In addition to supervising David's visits, Rutland also conducted weekly sessions with Samantha.[8] Rutland testified that these weekly sessions were to "listen and communicate" with Samantha. According to Rutland, during these visits Samantha made statements and drawings, indicating David had sexually abused her. Rachel filed a notice of her intent to introduce Samantha's statements from these sessions. Her notice cited Mississippi Rule of Evidence 803(25) and Mississippi Code Section 13-1-403 as authority for their admission.

¶10. At trial, Rutland tried to testify about Samantha's purported abuse revelations and about the drawings, but David objected. He claimed he lacked sufficient notice of certain statements—particularly the drawings—under Mississippi Code Section 13-1-403(2).[9] Though the chancellor sustained David's objection and excluded the drawings and some of Samantha's statements, Rutland was permitted to testify about the properly noticed statements. However, the chancellor waited to rule on their admissibility until after Rutland had finished testifying. At the December 4, 2013 hearing, the chancellor found Samantha's statements to Rutland were unreliable. The chancellor also found the relationship between Rachel and J. T. Rutland highly suspect. Specifically, the chancellor found Rutland's weekly

[8] Rachel began taking Samantha to Rutland for sessions approximately six months before supervised visitation began. The chancellor's December 21, 2012 temporary order ended these sessions.

[9] This statute was held unconstitutional by *Hall v. State*, 539 So. 2d 1338 (Miss. 1989).

sessions with Samantha were illogical, since they were neither aimed to disclose abuse nor to rehabilitate Samantha. The chancellor held that Samantha's statements did not meet the required indicia of reliability under Mississippi Rule of Evidence 803(25). And he excluded all of Samantha's drawings and statements to Rutland. On appeal, Rachel contends the chancellor erred in applying Mississippi Code Section 13-1-403(2) and not considering all of Samantha's statements under the hearsay exceptions in Mississippi Rules of Evidence 803(4) or 803(25).

### III. Reimbursement for Visitation

¶11. David's supervised visits to Lighthouse Ministries cost $150 per Saturday visit. The chancellor ordered David to pay the visitation costs. These visits began in December 2011 and continued until December 2012—when Lighthouse Ministries ended supervision services and the chancellor ordered additional supervisors for visitation. In his final judgment, the chancellor ordered Rachel to reimburse David the $8,080 he had paid to Lighthouse. Though Rachel did not contest the reimbursement in her post-judgment motions, on appeal she does. She now insists David did not seek reimbursement nor was reimbursement contemplated in the consent decree.

### Analysis

¶12. "The standard of review in child custody cases is limited." **Borden**, 167 So. 3d at 241 (¶ 4) (citing **Floyd v. Floyd**, 949 So. 2d 26, 28 (Miss. 2007)). If it is supported by substantial evidence, we must affirm a chancellor's factual findings unless the chancellor abused his or

her discretion, was manifestly wrong, clearly erroneous, or applied an erroneous legal standard. *Id*. (citing *Robinson v. Lanford*, 841 So. 2d 1119, 1122 (Miss. 2003)).

A.     *Abuse Allegations*

¶13.   Under Mississippi Code Section 93-5-23, a chancellor has two options for handling abuse allegations lodged during a custody proceeding. The chancellor may either (1) stay the proceeding until the allegations are fully investigated by DHS or (2) adjudicate the abuse allegations subject to Mississippi Code Sections 43-21-121 and 151 and the Mississippi Uniform Rules of Youth Court Practice.[10]   Here, the chancellor opted for the second approach.

¶14.   When a chancellor chooses to hear the abuse allegation during a custody hearing, appointment of a GAL is mandatory.[11]   As part of his or her duties, the GAL must either submit a written report or testify, and must make recommendations to the court if requested. *McDonald v. McDonald*, 39 So. 3d 868, 883 (¶ 49) (Miss. 2010) (quoting *D.J.L. v. Bolivar County Dep't of Human Servs. ex rel. McDaniel*, 824 So. 2d 617, 623 (Miss. 2002)).  The GAL is subject to cross-examination if testifying. *Id*.

B.     *Appellate Review*

---

[10] Miss. Code Ann. § 93-5-23 (Rev. 2013).

[11]*See* Miss. Code Ann. §§ 93-5-23 (Rev. 2013), 43-21-121 (Rev. 2015) (chancellors may hear and decide abuse allegations arising in custody proceedings, but *shall* appoint a GAL, who *shall* be an attorney) (emphasis added); *see also* Mississippi Uniform Rules of Youth Court Practice 2, 13(a)(5), (c) (if the chancery court retains jurisdiction over abuse allegations, the Mississippi Uniform Rules of Youth Court Practice apply and a GAL shall be appointed).

¶15. Though Rachel had previously contested only the chancellor's *Albright* analysis, where appeals concern the futures or interests of minor children, we have relaxed this general bar. *See **Gateley v. Gateley***, 158 So. 3d 296 (Miss. 2015), and ***Nat. Father v. United Methodist Children's Home***, 418 So. 2d 807 (Miss. 1982). We thus address her other claims.

¶16. The bulk of the issues Rachel raises deal with the GAL. Rachel insists the chancellor failed to summarize the GAL recommendations and include reasons for rejecting them and failed to properly instruct the GAL on her role and duties. And the GAL did not zealously represent Samantha and Larry and make custody and visitation recommendations.

¶17. Aside from the GAL claims, Rachel also suggests the chancellor erred in his *Albright* analysis, excluded admissible hearsay evidence, and improperly awarded David visitation costs.

### I.  GAL's Report & Recommendations

¶18. When appointment of a GAL is mandated by statute—as it is in this case—the chancellor "shall include at least a summary review of the qualifications and recommendations of the guardian ad litem in the court's findings of fact and conclusions of law." ***J.P.***, 987 So. 2d at 982 (¶ 20) (citing ***S.N.C.***, 755 So. 2d at 1082). And the GAL "'must submit a written report to the court during the hearing, or testify and thereby become available for cross-examination.'" ***McDonald***, 39 So. 3d at 883 (¶ 49) (quoting ***D.J.L.***, 824 So. 2d at 623). Furthermore, in cases where "the court rejects the recommendations of the guardian," the chancellor "must" include his or her "reasons for rejecting the guardian's

recommendations.'" *J. P.*, 987 So. 2d at 982 (¶ 20) (citing *Floyd*, 949 So. 2d at 29); *see also Borden*, 167 So. 3d at 243 (¶ 13) (citing *S.N.C.*, 755 So. 2d at 1082) ("when a chancellor's ruling is contrary to [that] recommendation . . .' the court must state 'the reasons for not adopting the . . . recommendation . . . in the findings of fact and conclusions of law.")

¶19.    After review, we disagree with Rachel that the chancellor's award of physical and legal custody of Samantha and Larry to David is a rejection of the GAL's visitation recommendation.  The GAL was tasked with assessing visitation, particularly in the early stages of this case when sexual-abuse allegations were made against David.  The chancellor did not require the GAL make a specific custody recommendation.  And indeed, in this case, the GAL made no custody recommendation.  So the fact the chancellor made his own independent custody assessment is certainly not itself error.

¶20.    However, the GAL did specifically recommended the chancellor appoint a neutral counselor to assess the children periodically.  The chancellor apparently rejected this recommendation without saying why.  Though this was error, we find it harmless since it ultimately does not affect custody.  It appears the recommendation was made to check, intermittently, on the children, perhaps to see if Rachel was undermining David's relationship with them after he was initially granted unsupervised visitation.  But regardless of the purpose, years have now passed since the chancellor awarded David custody of both children.[12]  And this omission alone does not undo the chancellor's custody award or warrant remand on a matter that has no bearing on custody.

---

[12] To the extent Rachel feels counseling is still necessary, nothing precludes her from raising this issue before the chancellor.

## II. GAL's Role, Performance, and Investigation

¶21. Rachel next argues the GAL's role was not defined and her investigation and report was insufficient. As to Rachel's first assertion, this Court has previously "encourage[d] chancellors to set forth the reasons" for appointing guardians in a written order and to explain the particular "role" the GAL is expected to play. *S. G. v. S. D.*, 13 So. 3d 269, 281 (¶ 48) (Miss. 2009). Here there was no written order, and Rachel claims the absence of one was error. We disagree. While this court has encouraged a written order appointing a GAL—and a written order is obviously the best practice—we have never mandated one. Further, there was no confusion over the GAL's intended role, particularly from Rachel's attorney:

| The Court: | I think in this case, the attorneys and I basically just acquiesced in she was going to be appointed to look into certain issues, and among them was the question of visitation and et cetera, and that's what she sat in on meetings about. If either of you have any other thoughts about what the instructions were for her or should have been, we ought to take that up. |
|---|---|
| | . . . |
| Mr. Denham: | But in any case, I just think—I think that what happened was there was no court order that was specifically entered; that everybody had an understanding that the guardian ad litem would do in this case what she does probably in 99 percent of the cases she has, and that is investigate the matter, report to The Court, and write a report. |

Lacking any obvious disagreement over the GAL's role, the mere absence of a written notice of the GAL's duties was not material here. We also note that both parties were clearly satisfied with the GAL's extensive experience and qualifications. So that is not an issue.

¶22. Our consideration of the sufficiency of the GAL's work, however, is a separate matter. Rachel attacks the guardian's work on this front, arguing she failed to protect Samantha's and Larry's interests by not interviewing necessary parties, not addressing certain witnesses and evidence, overlooking *Albright* factors, and not making visitation and custody recommendations. We begin review of these supposed inadequacies by emphasizing that "[t]his Court will uphold a chancellor's custody order even if it is partly based on a less-than-perfect guardian-ad-litem investigation." *Gateley*, 158 So. 3d at 300-01 (¶ 22) (citing *Lorenz v. Strait*, 987 So. 2d 427, 431 (Miss. 2008) (citations omitted)). And as always, even amid a less-than-ideal GAL performance, the ultimate custody decision always falls on the chancellor. *Id.* So the precise question we must answer is "whether the evidence in the record supports the chancellor's decision." *Id.*

¶23. To the extent Rachel tags the GAL with *Albright* and custody deficiencies, she misses that the GAL was *not* appointed for a custody recommendation. Rather, the reason the chancellor appointed a GAL was to investigate the sexual-abuse allegations and to secure and coordinate with experts to assess these claims.[13] Visitation issues were also to be considered. And the record shows the GAL completed these tasks. She retained and coordinated with experts,[14] sifted through the abuse issue, and produced a detailed report—ultimately making visitation recommendations to the chancellor. An abundance of additional information was

---

[13] The chancellor's December 21, 2012 order found that the court should appoint its own expert and the GAL would contact the expert and coordinate a meeting and/or interview.

[14] For example, retaining a clinical psychologist and coordinating with a forensic interviewer.

also before the chancellor, including both forensic interviews, extensive testimony from the parties and witnesses who supervised visitation, and the second interviewer's deposition. We thus find there was ample evidence for the chancellor to make a custody decision.

### III. *Albright* Analysis

¶24. The foremost consideration in any custody decision is " the best interests and welfare of the minor child." *Albright v. Albright*, 437 So. 2d 1003, 1004-05 (Miss. 1983). In *Albright*, we gave a list of factors[15] for chancellors to consider when "navigating" the "labyrinth of interests and emotions" involved in custody battles. *Lee v. Lee*, 798 So. 2d 1284, 1288 (¶ 15) (Miss. 2001) (citing *Albright*, 437 So. 2d at 1005). While there is an established list of *Albright* factors, these factors are not variables in a mathematical formula. Nor is an *Albright* analysis "premised solely on a scoring system" where findings on each factor are added and later compared to see which parent "wins." *O'Briant v. O'Briant*, 99 So. 3d 802, 805–06 (Miss. Ct. App. 2012) (citations omitted). Rather, the "factors exist to ensure the chancellor considers all the relevant facts" before making a decision. *Id.* (citations omitted). This is why our manifest-error review "is not a mechanical check of the chancellor's score card" to decide if he or she "'tallied' each parent's score correctly." *Id.* at 806 (citations omitted). We instead ask whether the chancellor considered all relevant facts, giving deference to the weight he or she assigns each factor.

---

[15] The *Albright* factors are: (1) age, health, and sex of the child, (2) continuity of care prior to separation, (3) parenting skills and willingness and capacity to provide primary child care, (4) employment and responsibilities of parent, (5) physical and mental health and age of parent, (6) emotional ties of parent and child, (7) moral fitness of parent, (8) home, school, and community record of child, (9) preference of child, (10) stability of the home environment, and (11) other factors relevant to the parent-child relationship.

¶25. With these principles in mind, we address Rachel's claim that the chancellor's custody decision and *Albright* analysis are flawed.[16] Her main grievance is that the chancellor improperly weighed her behavior—and the manner in which she handled the alleged abuse—against her. She also claims he put too much weight on her mental instability. Rachel weaves this argument through several of the *Albright* findings.[17]

¶26. Though the chancellor found the children's sex, age, and health favored neither party, Rachel claims Larry's age and health really favored her. When assessing this *Albright* factor, we point out that "age is only one of several factors to be considered." *Mercier v. Mercier*, 717 So. 2d 304, 307 (¶ 14) (Miss. 1998) (citation omitted). And over the years, the tender-years doctrine has been diminished and is now only a presumption. *Law v. Page*, 618 So. 2d 96, 101 (Miss.1993). The doctrine is "even less binding when the child is male." *Id.* (citation omitted). While in years past Larry's age may have favored Rachel, we see nothing in the record that contradicts the chancellor finding this factor favored neither parent. Nor is there any particular health-related reason that Larry's future medical needs favored Rachel.

¶27. Considering the continuity of care prior to separation, the chancellor found this factor favored David. While Rachel did largely stay home with Samantha, and later Larry, David would take over childcare duties after work. This included bathing Samantha and caring for her through the night. And when Rachel went back to school and began working as an extern for a therapy center, David handled childcare. The chancellor noted that if Rachel's abuse

---

[16] Rachel does not dispute the chancellor's findings for *Albright* factors (4), (7), and (9).

[17] *Albright* factors (2), (3), (5), (6), and (11).

13

allegations were to be believed, years went by without her reporting it. To him, this negated some of her more positive attributes on this factor. While the evidence is certainly close, we cannot say he chancellor erred in deeming this factor favored David.

¶28. As to parenting skills,[18] Rachel's behavior and judgment drew sharp criticism from the chancellor and also diminished his view of her parenting skills. He believed some of Rachel's better parenting skills were overshadowed by her questionable judgment. He was particularly troubled by her placing Samantha in perceived dangerous situations to try and gather evidence of sexual abuse.[19] He found this behavior concerning and relevant to this factor. This was a discretionary call on the chancellor's part. Because it is substantially supported, we do not second-guess it.

¶29. Considering home stability and employment, we see nothing vastly different between Rachel and David. Rachel claims David's work schedule and living arrangements[20] diminished his ability to care for Larry and Samantha. But the record shows she was in a similar situation. Rachel was living with her mother and had recently returned to the

---

[18] *Albright* factor (3).

[19] Rachel's reliance on *Brekeen*, *Hollon*, and *Borden* is misplaced. *Brekeen v. Brekeen*, 880 So. 2d 280 (Miss. 2004) (chancellor abused discretion by weighing mother's affair too heavily); *Hollon v. Hollon*, 784 So. 2d 943 (Miss. 2001) (chancellor improperly focused on mother's homosexual affair); and *Borden v. Borden*, 167 So. 3d 238 (Miss. 2014) (chancellor abused discretion by weighing mother's social misconduct too heavily). Here, we find the chancellor's focus on what he deemed were false sexual-abuse allegations and his assessment of Rachel's behavior were material not only to her credibility, but to her judgment and fitness as a parent. Thus, we find no error in his placing great emphasis on this evidence in his overall *Albright* analysis and custody decision.

[20] *Albright* factor (10).

14

workforce, seeking full-time employment. So both parties were on similar footing—either employed or seeking employment, and in temporary living arrangements. Also, they had both moved to different communities, having lived in Biloxi before separating and both later moving to Alabama. So there is support for the chancellor's finding that this factor favored neither party.

¶30. The chancellor also found the physical and mental health of the parents[21] favored David. Rachel testified about her paranoid thoughts and feelings. And, as mentioned, the chancellor was concerned with the way Rachel went about attempting to prove the purported abuse. He also felt Rachel pushed her unfounded beliefs on Samantha. Thus, there was factual support for the chancellor deeming Rachel the less mentally fit of the two.

¶31. Likewise, the chancellor pointed out in the emotional-ties factor that Rachel's conduct prevented David from developing a relationship with Larry. And the chancellor felt the sessions with J. T. Rutland hurt David's relationship with Samantha. The record also contradicts Rachel's claim that she is not openly hostile toward David. For example, Rachel admitted that her cell phone—the phone Samantha used to talk to David—listed David as "pedophile sociopath" on Caller ID. After review, we find no error in the chancellor believing this factor also favored David.

¶32. Finally, considering the home, school, and community factor, Rachel argues the chancellor erred by finding neither child was school-aged. Rachel is correct that this finding was factually inaccurate. While the chancellor was right that Larry was not school-aged, he

---

[21] ***Albright*** factor (5).

was wrong about Samantha. She was an eight-year-old second-grader at the time. However, reviewing the full *Albright* analysis, we can confidently say the erroneous belief Samantha was not school-aged bore no real impact on the chancellor's custody decision. The record shows both parties relocated to other communities after separating and each had temporary living arrangements. Samantha had attended her particular school only for a short time, starting when Rachel claimed abuse and moved with the children from Biloxi to Alabama. So the mistake about her school age was harmless.

¶33.   The bottom line is that our narrow standard of review prevents us from pondering whether we would have sized up the evidence differently. Rather, we must give deference to the chancellor's factual findings, asking if they were supported by substantial evidence. *See Martin v. Lowery*, 912 So. 2d 461, 464 (¶ 7) (Miss. 2005) (citing *Brooks v. Brooks*, 652 So. 2d 1113, 1124 (Miss. 1995)). We have long held chancellors have the ultimate discretion to weigh the evidence as they see fit when deciding what is in a particular child's best interest. And here, considering the overall *Albright* analysis, it is clear that Rachel's credibility, judgment, and behavior were weighed against her, contributing to the chancellor finding it was in the children's best interests that David have custody. We find substantial evidence supports this decision.

   **IV.   Hearsay Evidence**

16

¶34.　In ***Hall v. State***, this Court addressed Mississippi Code Section 13-1-403[22]— the Evidence of Child Sexual Abuse Act. ***Hall v. State***, 539 So. 2d 1338 (Miss. 1989). This legislative act generally placed a ten-day notice requirement on hearsay evidence in sex-abuse cases. In striking down this statute, we found that "trials are the core activity of the judiciary, so the promulgation of rules for the regulation of trials lie[s] at the core of the judicial power." ***Id.*** at 1346. So neither officers of "the legislative nor executive departments of government . . . had authority to confer legal validity upon the Evidence of Child Sexual Abuse Act." ***Id.*** Because the act lacked "legal validity" we found "it may not be regarded 'law' within Rule 802, Miss. R. Ev." ***Id***.

¶35.　Though it was Rachel who initially brought up the statute, she now claims the chancellor wrongly excluded admissible evidence under Mississippi Code Section 13-1-403(2). And she pushes a new claimed exception she did not raise at trial. She now suggests Samantha's statements to the counselor were admissible "For Purposes of Diagnosis and Treatment." Miss. R. Evid. 803(4).

¶36.　Our review shows that the chancellor's evidentiary rulings were actually twofold. At trial, he found Samantha's statements to Rutland were not only excluded under Section 13-1-403(2), but were still unreliable and inadmissable under Mississippi Rule of Evidence 803(25). While we find the chancellor was wrong to exclude Samantha's statements under Section 13-1-403(2)—a statute we struck down—he did find all of Samantha's statements

---

[22]　Section 13-1-403(2) required a defendant be notified of a proposed hearsay statement not less than ten (10) days prior to trial, including the written hearsay statement, along with time and circumstances surrounding the statement. Miss. Code Ann. § 13-1-403 (Rev. 2012).

were unreliable. Thus, the chancellor still deemed them inadmissible under Mississippi Rule of Evidence 803(25). We find no abuse of discretion in this evidentiary call.

¶37. As to Rachel's new Rule 803(4) argument—that the statements were admissible for diagnosis and treatment purposes—she did not advance this theory at trial.[23] And we refuse to hold the chancellor in error on a matter not presented to him.

### V. Visitation Reimbursement

¶38. Certain statutory requirements must be met to grant an irreconcilable differences divorce. *See **Perkins v. Perkins***, 787 So. 2d 1256 (Miss. 2001). The parties' consent is one requirement and "[s]uch consent must be in writing." Miss. Code Ann. § 93-5-2(3) (Rev. 2013). This "permit[s] the court to decide such issues . . . specifically set forth in such consent." Miss. Code Ann § 93-5-2(3) (Rev. 2013). To protect a party's rights, we have held the "provisions of the statute must be strictly complied with." ***Perkins***, 787 So. 2d at 1264 (¶ 24).

¶39. Rachel claims the consent decree did not contemplate David's request to recoup payments to Lighthouse for visitation. So, as she sees it, the chancellor could not decide that issue. She also argues the chancellor's ordering her to pay David $8,080 impacts a substantial right.

¶40. In the consent decree, the parties agreed to: "(i) the appropriateness, and amount of an award or attorney's fees and costs, including expert fees, to be awarded either party, if

---

[23] We point out Mississippi Rule of Evidence 803(4) appears inapplicable here. Rutland testified that the sessions with Samantha *were not* aimed at determining or diagnosing abuse or providing rehabilitation.

any." We note Rachel approved of Rutland and Lighthouse supervising David's visitation. The only reason supervised visitation was required was because Rachel claimed David sexually abused their daughter. After hearing evidence, the chancellor found the abuse claims baseless.

¶41. Rachel and David listed expert fees and costs in their consent decree. And the chancellor found the fees charged by Lighthouse Ministries subject to the consent decree. Furthermore, Rachel did not raise this issue in any of her post-judgment motions. Thus, the chancellor did not err in finding the supervision fees subject to the consent decree. Nor did he err in awarding these fees to David.

**Conclusion**

¶42. We affirm the chancellor's custody award, exclusion of hearsay evidence, and award of visitation costs to David. While we find the chancellor's failure to explain his rejection of the GAL's counseling recommendation was error, it was harmless. We affirm.

¶43. **AFFIRMED.**

**WALLER, C.J., DICKINSON AND RANDOLPH, P.JJ., LAMAR, KITCHENS, KING, COLEMAN AND BEAM, JJ., CONCUR.**

19