# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-CA-00091-COA

**JONATHAN GRAHAM EMBREY**                                      **APPELLANT**

**v.**

**MARIA YOUNG**                                                       **APPELLEE**

DATE OF JUDGMENT:                01/04/2021
TRIAL JUDGE:                     HON. VICKI B. DANIELS
COURT FROM WHICH APPEALED:       TATE COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:          JERRY WESLEY HISAW
ATTORNEY FOR APPELLEE:           MARIA YOUNG (PRO SE)
NATURE OF THE CASE:              CIVIL - DOMESTIC RELATIONS
DISPOSITION:                     AFFIRMED - 11/30/2021
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE WILSON, P.J., WESTBROOKS AND McDONALD, JJ.

### McDONALD, J., FOR THE COURT:

¶1.     Jonathan Graham Embrey and Maria Young are the parents of two minor children, D.M.E. and N.A.E.[1]  After Jonathan and Maria ended their six-year relationship, Jonathan filed a petition for legitimation, sole child custody, and other relief in the Tate County Chancery Court.  The chancellor found that Jonathan was the "natural and biological father" of both children, awarded the parties joint legal custody of the minor children, awarded Maria physical custody, and awarded Jonathan visitation.  The court also ordered Jonathan to pay child support.  On appeal, Jonathan argues that the chancellor erred by failing to appoint a guardian ad litem (GAL) and by awarding Maria custody of the children.  Finding

---

[1] We have replaced the minor children's names with initials.

no error, we affirm the chancellor's rulings.

## Statement of the Facts and Procedural History

¶2.    In 2011, thirty-year-old Jonathan met twenty-year-old Maria at the Four Seasons Garden Center, where they were both employed. They began dating, and in April 2012, they moved into Jonathan's grandmother's house.[2] A few months later, Maria became pregnant with their first child. During Maria's pregnancy, Jonathan left his job at the Four Seasons and then worked for FedEx. Maria continued to work at the Four Seasons until a few months before the birth of their son, D.M.E., on May 22, 2013. Maria returned to work a few months later. As the years went by, according to Maria, Jonathan became verbally and physically abusive. Although she threatened to leave, she did not. When Jonathan's grandmother died in 2016, his parents moved into the house with him, Maria, and D.M.E.

¶3.    In 2018, when Maria and Jonathan were expecting their second child, Maria once again stopped working at the Four Seasons as her pregnancy progressed. Maria and Jonathan separated in November 2018 while she was pregnant with the second child. Maria and D.M.E. moved into her mother's house and then to her grandmother's house. During this time period, Maria and Jonathan had disagreements about a visitation schedule for D.M.E.

¶4.    On November 9, 2018, Jonathan filed a petition for legitimation, child custody, and other relief. Jonathan argued that he should be awarded both temporary and permanent legal custody, physical custody, and control of D.M.E. and his yet unborn child. Additionally, Jonathan sought specific periods of visitation with the minor children, a division of all

---

[2] Jonathan already had custody of a daughter from a previous relationship who moved into the house with them.

medical expenses, deductions for both children for federal and state income tax purposes, and an emergency hearing because D.M.E. had not been to school in four days.

¶5.    The chancery court entered a temporary order on November 29, 2018, giving both parties joint legal and physical custody of D.M.E. until a final order was entered. The order included specific time periods and holidays that Jonathan and Maria would have physical custody of D.M.E. Additionally, the order allowed Jonathan and his family to be present during the birth of his second child, and the court ordered that after January 6, 2019, the parties would alternate physical custody of D.M.E. on a week-to-week basis. The court also ordered the parties to work together to establish a visitation schedule for the unborn child. If they could not agree, then the court would set visitation. Further, neither party was required to pay child support until the chancellor reviewed the matter on January 28, 2019.

¶6.    On December 21, 2018, Maria gave birth to their second child, N.A.E. When Jonathan and Maria could not agree on visitation for N.A.E., on January 8, 2019, the chancery court entered a "Holiday Order,"[3] providing that Jonathan would have visitation every Monday, Wednesday, and Friday and on Christmas Day and New Year's Day.

¶7.    The court entered another temporary order on January 30, 2019. The order provided that Jonathan and Maria would continue to exercise joint legal and joint physical care, custody, and control of the minor children. The court also ordered that D.M.E. undergo counseling.[4] Maria was also ordered to provide breast milk for N.A.E. when Jonathan had

_____

[3] The "Holiday Order" was signed on December 26, 2018.

[4] The court did not specify in its order why five-year-old D.M.E. needed to enroll in counseling.

3

physical custody. Additionally, the court enjoined the parties and their families from making negative comments about the other party in the presence of the minor children. Further, the court ordered Jonathan and Maria to attend and complete a parenting class in Tennessee and submit proof of attendance to the court. The court also allowed Maria to remove several of her personal items from Jonathan's property. The court set the matter for trial for December 18, 2020.

¶8. Later in 2019, Jonathan told Maria that D.M.E. had been sexually abused by his fourteen-year-old cousin on Maria's side of the family. Jonathan could not give a specific date of the abuse. Because of the allegations, the parties decided to take D.M.E. to see a therapist regarding the matter. D.M.E. saw Ashley Schachterle, a mental health therapist at Journey to New Beginnings, in Southaven, Mississippi, beginning in May 2019. She saw D.M.E. a total of fifteen times until September 2019. Schachterle concluded that D.M.E.'s sexual-abuse claims were unsubstantiated.

¶9. Nearly two years after Jonathan filed his petition for legitimation and custody, on October 30, 2020, Maria filed a response and a counter-petition. She requested that Jonathan's petition be dismissed at his cost and that she be awarded attorney's fees. Maria also requested permanent physical custody and joint legal custody of both minor children and that Jonathan be ordered to pay their educational, extracurricular, and child-care expenses, as well as any medical, orthodontic, or dental expenses not covered by insurance.

¶10. Prior to the trial, both Jonathan and Maria attended and completed the mandatory parenting class as the court had ordered.

4

¶11.    The chancery court tried the matter on December 18, 2020.  Schachterle testified first as an out-of-order witness for Maria.  She stated that the purpose of D.M.E.'s sessions was to address sexual-abuse allegations.  According to Schachterle, D.M.E.'s allegations were inconsistent and would change depending on which parent was present for the sessions.  Schachterle stated that D.M.E. initially said that he was sexually abused at Maria's house, but he later said it happened at school.  D.M.E. also told her that Jonathan would tell him what to say about the abuse.  Specifically, Schachterle testified that D.M.E. said, "Dad told me to tell you that John touched me.  He told me what to say in therapy today."

¶12.    Schachterle stated that she could not say with 100% certainty whether the abuse happened.  She sent two reports to Child Protection Services (CPS), which fully investigated the matter.  After its investigation, CPS found that the sexual-abuse allegations were unsubstantiated and closed the case.[5]  Schachterle advised Maria to create or devise a safety plan for the children that included supervision of the children at all times.  Schachterle recommended that D.M.E. undergo a full psychological evaluation to test him for Autism Spectrum Disorder, and she testified that Maria put D.M.E. on the waiting list for such an evaluation.

¶13.    Additionally, Schachterle discussed a session she conducted with both Jonathan and Maria to discuss how their behavior toward each other had affected D.M.E.  She stated that Maria remained calm, but she had to ask Jonathan to calm down on several occasions.  She advised them to attend co-parenting therapy sessions, which was different from the parenting

_____

[5] Neither Schachterle's reports nor the CPS report is in the record.

5

class that the chancery court had ordered them to attend. According to Schachterle, Maria attended the classes, but Jonathan did not. However, at trial she could not recommend that D.M.E. should primarily live with either Jonathan or Maria because she had not seen D.M.E. in over a year. Schachterle said that D.M.E. was having a hard time making the transition from living with his mother for a week and then with his father for a week because his parents were not getting along. Schachterle felt that D.M.E. would benefit from a structured routine.

¶14. Jonathan presented several witnesses, including his mother, Sherry Embrey, Maria as an adverse witness, and himself. Maria testified that she had tried to leave Jonathan prior to 2018 but that he would take her phone or keys and drive away with D.M.E. to prevent her from leaving. She also testified that she kept a well-documented journal of Jonathan's verbal abuse, which was entered into evidence. Maria stated that D.M.E. never told her that his cousin was touching him inappropriately. She only became aware of the allegations in March 2019 after Jonathan and his counsel told her about them. Maria stated that at a later encounter, Maria stated that Jonathan began to yell and tell her not to allow D.M.E. around his male or female cousins. Maria testified that CPS conducted a full investigation into the sexual-abuse allegations, which included a forensic interview with D.M.E. at Maria's home. CPS found that the sexual-abuse claims were unsubstantiated.

¶15. At the time of the trial, Maria stated that she was a self-employed artist. In her financial statements, she reported that she made about $500 per month. Maria testified that she became engaged to her fiancé, Kyle Crenshaw, on October 2, 2020, and that she later

moved in with him. Since then, Maria became a full-time stay-at-home mother and worked as an artist only occasionally.

¶16.    Jonathan's mother, Sherry, testified that she had been in D.M.E.'s life since he was born. According to Sherry, Jonathan would take D.M.E. to his doctor's appointments, and she watched D.M.E. the majority of the time. Additionally, prior to Maria's leaving Jonathan, Sherry testified that Maria kept a filthy house. She also testified that as Maria's supervisor at the Four Seasons, Maria was offered light-duty work before N.A.E. was born, but Maria instead decided not to work.[6] Sherry testified that based on her observations of the children with Jonathan, in her opinion, he should receive custody.

¶17.    Jonathan testified there was no doubt in his mind that D.M.E.'s older cousin engaged in inappropriate actions with D.M.E. Jonathan could not remember the exact dates that any abuse occurred, but he alleged that it happened three times: twice at Maria's grandmother's house and a third time at the older cousin's house. Jonathan admitted that he made offensive and derogatory comments to Maria when they were alone and in front of the children, but he apologized for his actions. Additionally, Jonathan testified that he had a routine for D.M.E., including bedtimes of 9:00 p.m. on the weekdays and 10:00 p.m. on the weekends. He also stated that he made more money than Maria because he had more than one job, including web development, painting, and computer programming. He said he averaged $1,618.50 monthly.

¶18.    In Maria's case-in-chief, she testified and also called Schachterle, her aunt Lisa Walker, and her fiancé Kyle as witnesses. Lisa, who is the mother of the cousin who

---

[6] Maria testified that she worked at the Four Seasons until the last few months of her pregnancy.

allegedly abused D.M.E., testified that during Maria's baby shower for N.A.E., Maria appeared to be distraught, very depressed, and scared. Lisa and other family members contacted law enforcement. Maria and Lisa filed a police report with the DeSoto County Sheriff's Department in which Maria stated that she was fleeing from a very dangerous situation. In 2018, when they knew Jonathan would be at work, Lisa and Maria went to his place and took only things that belonged to Maria and clothes for D.M.E. Shortly after, Lisa said Maria moved in with her mother. Lisa testified that her son and D.M.E. had never been alone together. She also stated that she resided in Louisiana and that D.M.E. had never been to Louisiana or their house.

¶19. Kyle testified that he and Maria started dating on July 25, 2019, and became engaged on October 2, 2020. She moved into his house with the children on October 25, 2020. Kyle stated that he and Maria had dated for ten months before he was introduced to her children. He further stated that "[Maria] is a great mother. She stays at home and cooks all their meals and does everything that she's supposed to and she's just a really good mother and, I mean, she's a great mother is all I can say." Kyle testified that he was a fire suppresser and fire-extinguisher technician and that he made enough money to provide for Maria and her children. Maria was a stay-at-home mother and remained so after they got married.

¶20. The chancellor found that Jonathan was the "natural and biological father" of both children. At the end of the hearing, the chancellor awarded both the parties joint legal custody of the minor children and awarded Maria sole physical custody. The court established a visitation schedule for Jonathan, which included visitation every other weekend,

commencing Fridays at 6:00 p.m. and continuing until Sundays at 6:00 p.m., and visitation every other Wednesday from 3:30 p.m. to 7:00 p.m. Jonathan and Maria would alternate holidays every year except for Thanksgiving and Christmas. The parties would split that visitation. They would also both spend time with the minor children on each child's birthdays. Jonathan would have custody of his children on every Father's Day. The parties would alternate weekly periods of visitation during June and July.

¶21. The chancellor ordered Jonathan to pay $300 per month in child support. The court allowed Jonathan to claim D.M.E. for federal and state income tax purposes for 2020, and Maria could claim N.A.E. After the 2020 tax year, Maria could claim both children on her tax filings. The court's ruling was later entered in a written order on January 4, 2021.

¶22. Jonathan appealed from the chancery court's order on January 27, 2021, claiming (1) that the chancery court erred in failing to appoint a GAL, as required by statute; and (2) that the chancery court erred in awarding custody of the minor children to Maria. We do not find that the chancellor erred, and we affirm the court's order.

### Standard of Review

¶23. This Court's standard of review concerning child custody is limited. *Myers v. Myers*, 270 So. 3d 1060, 1063 (¶4) (Miss. Ct. App. 2018) (citing *C.W.L. v. R.A.*, 919 So. 2d 267, 270 (¶8) (Miss. Ct. App. 2005)). In a child-custody case, an appellate court "will not disturb a chancellor's judgment when supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong, clearly erroneous, or an erroneous legal standard was applied." *Woodham v. Woodham*, 17 So. 3d 153, 156 (¶6) (Miss. Ct. App. 2009) (citing

9

*Chapel v. Chapel*, 876 So. 2d 290, 292-93 (¶8) (Miss. 2004)). On appeal in a child-custody case, the issue is not whether this Court "agrees with the chancellor's ruling," but whether "the chancellor's ruling is supported by credible evidence." *Harden v. Scarborough*, 240 So. 3d 1246, 1251 (¶9) (Miss. Ct. App. 2018) (citing *Hammers v. Hammers*, 890 So. 2d 944, 950 (¶14) (Miss. Ct. App. 2004)).

## Discussion

### I. Whether the chancellor erred in failing to appoint a GAL, as required by statute.

¶24. The Mississippi Supreme Court has held that "[i]n child-custody cases where [allegations of] abuse and/or neglect are raised, the chancellor's decision to appoint a guardian ad litem may be mandatory or discretionary." *Carter v. Carter*, 204 So. 3d 747, 758-59 (¶50) (Miss. 2016). Our Supreme Court has also held that under Mississippi Code Annotated section 93-5-23 (Rev. 2018), the chancellor "is provided discretion to determine if issues of abuse or neglect *have sufficient factual basis to support the appointment of a guardian ad litem*." *Barber v. Barber*, 288 So. 3d 325, 332 (¶27) (Miss. 2020) (emphasis added) (quoting *Carter*, 204 So. 3d at 759 (¶51)). The statute gives "the chancellor some discretion in determining whether there is a legitimate issue of neglect or abuse even in those situations where one party elects to make such an assertion in the pleadings." *Monk v. Fountain*, 296 So. 3d 761, 764 (¶14) (Miss. Ct. App. 2020) (quoting *Johnson v. Johnson*, 872 So. 2d 92, 94 (¶8) (Miss. Ct. App. 2004)). The chancellor is not required to "appoint[] . . . a guardian ad litem based merely on an unsubstantiated assertion found in the pleadings of one of the parties." *Carter*, 204 So. 3d at 759 (¶52) (quoting *Johnson*, 872 So. 2d at 94 (¶8)).

10

¶25. In *Monk*, the chancery court found that prior to the trial, Monk did not produce sufficient evidence to support her allegations of abuse or neglect to require the appointment of a GAL. *Monk*, 296 So. 3d at 765 (¶18). At trial, Monk, who was the minor child's aunt, made several allegations that the Fountains, the minor child's legal and natural parents, were abusive or neglectful, e.g., making the minor child eat soap because she did not stop saying a curse word. *Id*. at 766 (¶20). This Court found that the chancellor did not abuse his discretion by not appointing a GAL because Monk belatedly made allegations of abuse. *Id*. at 766 (¶22). We also noted that Monk's credibility was "undercut significantly by the fact that she failed to disclose any specific allegations of abuse in discovery." *Id*. Recently, this Court applied *Monk* in *Savell v. Manning*, 325 So. 3d 1208, 1217-18 (¶31) (Miss. Ct. App. 2021), when we affirmed a chancery court's denial of a request to appoint a GAL to investigate an abuse allegation because of the lack of specifics regarding the abuse allegations.

¶26. In this case, Jonathan did not move for an appointment of a GAL. Like *Monk*, Jonathan never asserted in his pleadings that D.M.E. suffered from sexual abuse. Moreover, at trial, Jonathan failed to testify to the specifics of the abuse he alleged, such as the dates that the purported abuse occurred or the nature of what occurred. The chancellor became aware of the abuse allegations for the first time at trial, and even then, she was provided nothing to substantiate Jonathan's allegation of abuse.

¶27. Moreover, the testimony at trial contradicted Jonathan's allegations. Jonathan and Maria had taken D.M.E. to a mental health therapist after Jonathan told Maria that D.M.E.

11

had been abused. D.M.E.'s mental health therapist, Schachterle, testified that not only were D.M.E.'s statements inconsistent but that Jonathan had coached D.M.E. on what to say during the sessions. In fact, Schachterle stated D.M.E. told her that "Dad told me to tell you that John touched me. He told me what to say in therapy today." Further, CPS conducted a full investigation into the matter, which included an interview with D.M.E. at Maria's home. CPS found that D.M.E.'s allegations were unsubstantiated and meritless. The chancellor herself even stated that based on testimony at trial, the sexual-abuse allegation seemed unsubstantiated. A "chancellor is required to appoint a guardian ad litem, whether the parties requested a guardian ad litem or not only if there is a sufficient factual basis to support a legitimate claim of abuse or neglect." *Carter*, 204 So. 3d at 759 (¶¶50-51). Here, there was neither a request for a GAL nor a sufficient factual basis of sexual abuse to require the chancellor to appoint a GAL. Thus, under these facts, we find no abuse of discretion or clear error.

II. **Whether the chancellor erred in awarding custody of the minor children to Maria.**

¶28. The supreme court has established that "[t]he best interest of the child is paramount in any child-custody case." *Wilson v. Davis*, 181 So. 3d 991, 995 (¶7) (Miss. 2016) (quoting *Smith v. Smith*, 97 So. 3d 43, 46 (¶8) (Miss. 2012)). Put another way, "[t]he polestar consideration in all child custody cases is the best interest and welfare of the children." *Myers*, 270 So. 3d at 1063 (¶6). To determine the best interest of the child, the Mississippi Supreme Court in *Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983), identified specific criteria that the chancery court should address. The *Albright* factors include the

12

following:

> (1) the child's age, health, and sex; (2) which parent had the continuity of care before the separation; (3) which parent has the best parenting skills; (4) which parent has the willingness and capacity to provide the primary child care; (5) each parent's employment and its responsibilities; (6) each parent's physical and mental health and age; (7) the emotional ties between the child and each parent; (8) each parent's moral fitness; (9) the child's home, school, and community record; (10) the child's preference, if the child is over twelve years old; (11) the stability of the home environment; and (12) any other relevant equitable factor.

*Stewart v. Stewart*, 309 So. 3d 44, 91 (¶154) (Miss. Ct. App. 2020) (quoting *Albright*, 437 So. 2d at 1005)).

¶29.    "The chancellor is required to address each of the *Albright* factors that [are] applicable to the case before him." *Edwards v. Edwards*, 189 So. 3d 1284, 1286 (¶8) (Miss. Ct. App. 2016). The chancellor need not decide that each factor favors one parent or the other. *Vassar v. Vassar*, 228 So. 3d 367, 375 (¶26) (Miss Ct. App. 2017) (citing *Weeks v. Weeks*, 989 So. 2d 408, 411 (¶12) (Miss. Ct. App. 2008)). Nor does the *Albright* analysis require the chancellor to award custody "to the parent who wins the most factors." *Blakely v. Blakely*, 88 So. 3d 798, 803 (¶17) (Miss. Ct. App. 2012). "Rather, the chancellor is simply required to address and consider the relevant factors in determining what custody arrangement would be in the child's best interest." *Sanders v. Sanders*, 281 So. 3d 1043, 1050 (¶23) (Miss. Ct. App. 2019). "The point of *Albright* is to identify the custody arrangement that would be in the child's best interest—not to determine what is in either parent's best interest or which parent is the better person." *Vassar*, 228 So. 3d at 375 (¶26).

¶30.    Jonathan challenges only five of the chancellor's *Albright* findings. We address his

arguments below.

## A. Age, Health, and Sex of the Child

¶31. In the chancery court's analysis of the age, health, and the sex of the child, Jonathan takes issue with the court's application of the tender years doctrine. At the time of the hearing, D.M.E. was seven years old, and N.A.E. was two years old. The chancellor found that D.M.E.'s age was a neutral factor but that N.A.E.'s age favored Maria because he was a young child of tender years. We find no error in the chancellor's finding.

¶32. Historically, "[t]he tender-years doctrine has traditionally provided that if a child is of such tender age as to require the mother's care for his or her physical welfare, he or she should be awarded to the mother's custody." *McCarty v. McCarty*, 52 So. 3d 1221, 1228 (¶30) (Miss. Ct. App. 2011) (citing *Montgomery v. Montgomery*, 20 So. 3d 39, 44 (¶22) (Miss. Ct. App. 2009)). This Court has addressed the present state of the doctrine:

> Prior to the 1980s, our Supreme Court "held that if the mother of a child of tender years . . . is . . . fit, then she should have custody." *Law v. Page*, 618 So. 2d 96, 101 (Miss. 1993). However, "over the years, the tender-years doctrine has been diminished and is now only a presumption." *Smith v. Smith*, 206 So. 3d 502, 513 (¶26) (Miss. 2016) (citing *Law*). "The doctrine is 'even less binding when the child is male.'" *Id*. (quoting *Law*). Today, "age is only one of several factors to be considered" under *Albright. Id*. (quoting *Mercier v. Mercier*, 717 So. 2d 304, 317 (¶14) (Miss. 1998)).

*Harden*, 240 So. 3d at 1252 (¶13).

¶33. In this case, the chancellor found that the tender years doctrine favored Maria with respect to N.A.E.'s custody. Maria had been breastfeeding N.A.E., and he was only two years old at the time of trial. Maria was at home all day to tend to the child, and Jonathan presented no evidence to rebut the presumption that the child's young age favored Maria.

14

Therefore, we hold that the chancellor did not err or abuse her discretion in finding that N.A.E.'s young age favored Maria.

¶34. Jonathan also argues that the chancellor did not make a finding as to the health of the minor as a factor affecting the custody decision. On the contrary, the chancellor specifically discussed the health of the children throughout her *Albright* analysis. Specifically, the chancellor found that based on Schachterle's testimony, D.M.E. may be on the autism spectrum and should be tested. The chancellor further considered the testimony that it would be in D.M.E.'s best interest to have a stable and structured routine due to his potential autism. The chancellor noted that due to the nature of Maria's work, she would be more able to assist D.M.E. Therefore, Jonathan's claim that the chancery court failed to address the health issue is without merit.

### B. Employment of the Parents

¶35. The chancellor found that this factor slightly favored Maria because she is self-employed and can do her artwork at her leisure. Additionally, Maria had become a stay-at-home parent after moving in with her fiancé. Jonathan argues that the court erred in its findings because Maria did not get paid regularly and that he works from home "a great deal."

¶36. This Court has stated that "[t]his factor appears to be applied in two ways: either to prefer a parent who draws an income over one who does not, or, more often, to prefer a parent who works less or not at all and can therefore spend more time with his children." *Tedford v. Tedford*, 312 So. 3d 420, 426 (¶25) (Miss. Ct. App. 2021) (quoting *Owens v.*

*Owens*, 950 So. 2d 202, 210 (¶26) (Miss. Ct. App. 2006)). We are not to retry the case but to determine if there is sufficient evidence in the record to support the chancellor's findings. Here again, we cannot find that the chancery court's findings were in error because the evidence supported the court's findings that Maria worked less and had a flexible schedule, and therefore she could spend more time with the children.

### C. Moral Fitness of the Parents

¶37. Jonathan argues that the chancellor erred in finding that this factor was neutral. Specifically, Jonathan asserts that Maria had been cohabiting with her fiancé and exposed the children to men other than their father. Additionally, he alleged that Maria had some sort of "relationship" with her stepbrother at some unspecified time in the past. He also asserts that Maria's mother is married to her first cousin, without giving any specifics of how this relationship was detrimental to D.M.E. or N.A.E. Finally, Jonathan stated that Maria abused drugs while she was pregnant with D.M.E.

¶38. Maria's fiancé, Kyle, testified that he was not introduced to Maria's children until after they had been dating for ten months. Jonathan did not give a specific time frame or explain how Maria's alleged relationship with her stepbrother was detrimental to the parties' children. At trial, Maria admitted to smoking marijuana while she was pregnant with D.M.E. While this Court acknowledges the concern that Maria abused drugs while pregnant, we also note that this activity occurred almost eight years prior to the trial. The record does not show that Maria abused any drugs after 2013. Further, the record also shows that Jonathan himself had been arrested for possession of marijuana at an undisclosed time.

16

¶39. On appeal, Jonathan also discusses Maria's mother's relationships. He did not raise the issue of Maria's mother's moral fitness to the chancery court. Thus, it is waived.[7] Despite the waiver, this Court does not find the moral fitness of Maria's mother relevant to the dispute over custody between Maria and Jonathan because the children live with Maria and Kyle. Further, there is no evidence that Maria's mother ever caused any harm to the children. Thus, this issue is without merit.

¶40. The chancellor found that the moral-fitness factor was neutral because moral fitness goes "to truthfulness and veracity and not teaching your children to steal and not teaching your children to, you know, do bad things," and she did not hear any testimony that either parent was morally unfit. Because the record supports this finding, there is no merit to these arguments for reversal.

### D.     Parenting Skills

¶41. The chancellor found that the parenting-skills factor favored Maria because of the derogatory language Jonathan used against Maria in the presence of the children. Specifically, the court stated that the fact that "Dad [(Jonathan)] berated, belittled, threatened, talked so ugly to [Maria] and just acted absolutely inappropriate and that is horrible parenting skills."

¶42. "The credibility of the witnesses and the weight of their testimony, as well as the interpretation of evidence where it is capable of more than one reasonable interpretation, are primarily for the chancellor as the trier of facts." *Myers*, 270 So. 3d at 1065 (¶14) (quoting

---

[7] "Errors raised for the first time on appeal will not be considered." *Almasri v. Miss. Dep't of Revenue*, 282 So. 3d 698, 702 (¶10) (Miss. Ct. App. 2019).

*Johnson v. Gray*, 859 So. 2d 1006, 1014 (¶36) (Miss. 2003)). Multiple witnesses, including

Jonathan himself, stated that he would talk badly about Maria in front their children. For

example, Jonathan and Maria took D.M.E. to the dentist's office for dental surgery in 2019.

While in the waiting room, in the presence of D.M.E., Jonathan made several offensive

remarks to Maria, such as calling her a "f***ing inbred slut," that she was disfigured because

of inbreeding, that he would find a way to put her mother in jail, and that she was a "slut"

just like her mother. Jonathan also made physical threats toward Maria. This incident went

on for an hour and a half. After this incident occurred, and after the completion of the

mandatory parenting class, Jonathan continued to berate and threaten Maria in front of the

children. Further, while Maria attended parenting therapy at the recommendation of

D.M.E.'s mental health therapist, Jonathan did not attend and stated that it was unnecessary.

Based on the foregoing evidence, we find that the chancellor's determination of the

parenting-skills factor favoring Maria was supported by the record.

### E. Other Factors Relevant to Child Custody Separation of the Siblings

¶43. Jonathan argues that the chancellor erred in her *Albright* analysis by not considering

D.M.E. and N.A.E.'s separation from his other child and their half-sibling. But again,

Jonathan did not raise this argument to the chancery court; thus, it is waived on appeal.

*Almasri*, 282 So. 3d at 702 (¶10). Despite the waiver, this Court has held that "there was no

requirement that the chancellor specifically address the question of siblings and custody."

*Dunnam v. Dunnam*, 270 So. 3d 245, 250 (¶19) (Miss. Ct. App. 2018) (citing *C.A.M.F. v.

J.B.M.*, 972 So. 2d 656, 661 (¶23) (Miss. Ct. App. 2007)). "It is not a separate *Albright*

18

factor but a question which the chancellor may consider along with the best interest of the child." *Id.* (citing *Albright*, 437 So. 2d at 1005). Further, "[a] desire to avoid "the separation of siblings should not override a child's best interest in a custody determination." *Riley v. Heisinger*, 302 So. 3d 1243, 1258 (¶60) (Miss. Ct. App. 2020) (quoting *Owens*, 950 So. 2d at 212 (¶35)). Thus, the issue of separation of the siblings was an issue that the chancellor had the discretion to weigh as she saw fit. We find no abuse of her discretion in this case.

¶44.    In any child-custody case, courts must determine what is in the best interest of the child. In this case, the chancellor discussed each of the *Albright* factors and properly found that it would be in the best interest of the children for Maria to have sole physical custody. The Mississippi Supreme Court has held that "the chancellor has the ultimate discretion to weigh the evidence the way he sees fit." *Dunnam*, 270 So. 3d at 249 (¶12). We "cannot reweigh the evidence and must defer to the chancellor's findings of the facts, so long as they are supported by substantial evidence." *Hall v. Hall*, 134 So. 3d 822, 828 (¶21) (Miss. Ct. App. 2014). We also give deference to the weight that the chancellor assigned to each factor. *Smith*, 206 So. 3d at 513 (¶24). In this case, the chancellor's factual findings are not clearly erroneous or manifestly wrong, and she did not abuse her discretion in applying the *Albright* factors. Therefore, we find no reversible error in the chancellor's *Albright* analysis.

## Conclusion

¶45.    Because there was insufficient and unsubstantiated evidence of sexual abuse of the minor while he was in Maria's care, we find that the chancery court was not required to appoint a GAL. Additionally, we find that the chancery court did not abuse its discretion in

19

its analysis of the *Albright* factors and its award of sole physical custody of the minor children to Maria.

¶46. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.**