# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-CA-00814-COA

**SAMUEL TAYLOR SHIPLEY**                                        **APPELLANT**

**v.**

**KRYSTALYNN LOPEZ SHIPLEY**                                     **APPELLEE**

DATE OF JUDGMENT:           06/23/2023
TRIAL JUDGE:                HON. CHARLES E. SMITH
COURT FROM WHICH APPEALED:  LAUDERDALE COUNTY CHANCERY
                            COURT
ATTORNEY FOR APPELLANT:     JOHN S. GRANT IV
ATTORNEY FOR APPELLEE:      JEFFREY BIRL RIMES
NATURE OF THE CASE:         CIVIL - CUSTODY
DISPOSITION:                AFFIRMED - 05/13/2025
MOTION FOR REHEARING FILED:

**BEFORE BARNES, C.J., WESTBROOKS AND WEDDLE, JJ.**

**WESTBROOKS, J., FOR THE COURT:**

¶1.     On June 23, 2023, the Lauderdale County Chancery Court entered an opinion and final judgment ruling on Krystalynn Shipley's amended petition to cite her ex-husband Samuel Shipley in contempt and for modification of a court order, as well as two additional motions to cite him for contempt. The final judgment and opinion modified the previous custody arrangement and granted Krystalynn sole physical and legal custody of their children. Aggrieved by the ruling of the chancery court, Samuel appeals.

## FACTS AND PROCEDURAL HISTORY

### I.      Divorce and Custody Proceedings

¶2.     Samuel and Krystalynn married in April 2012. During the marriage, they had three

boys, S.S., N.S., and L.S.[1] After approximately nine years of marriage, Samuel and Krystalynn separated, and in May 2021, they were granted an irreconcilable-differences divorce. The chancery court approved their "Property Settlement and Child Custody Agreement," which was incorporated into the "Final Judgment Granting Divorce." Samuel and Krystalynn agreed to joint physical custody. Physical custody alternated on a "seven days on, seven days off" schedule. Samuel and Krystalynn also agreed to joint legal custody.

¶3. Pursuant to Mississippi Code Annotated section 93-5-24(5)(e) (Rev. 2021), the agreement required them to "share the decision-making rights, the responsibilities and authority relating to health, education and welfare of the minor children, [and it] obligates each party to exchange information concerning the health, education and welfare of the minor children, and . . . confer with the other in the exercise of decision making rights, responsibilities and authority." They agreed that if a disagreement arose, Krystalynn would be given the final say "regarding the minor children's education and medical," and Samuel would have the final say "as to the general welfare and extracurricular/recreational decisions of the [children]." Because of the shared parenting arrangement, neither parent paid the other child support. Samuel and Krystalynn also agreed to equally divide health expenses and extracurricular-activity costs for the boys.

## II. Modification Proceedings

---

[1] We use initials to protect the privacy of the minor children. At the time the appeal was filed, S.S. was nine, N.S. was seven, and L.S. was four.

¶4.    On February 4, 2022, Krystalynn filed an "Amended Petition to Cite Respondent in Contempt and for Modification" seeking to modify the final judgment granting the divorce. In this amended petition, Krystalynn stated:

> The Petitioner would further show pursuant to the Agreement, the parties share joint legal and joint physical custody. The Petitioner would show that the agreement is not working, the parties can't co-parent, and that it is in the best interest of the minor children that the Petitioner be granted the exclusive, care, custody and control of the minor children subject to visitation on the part of the Respondent.

Hearings on this petition took place over several different dates—April 7, 2022; October 18, 2022; and June 13, 2023.

### A.    April 7, 2022 Hearing

¶5.    On the April 2022 hearing date, Samuel was unrepresented by legal counsel. At this hearing, Samuel made an ore tenus motion to the court for a continuance and requested Krystalynn be granted temporary physical custody for three months. He made this request because at the time he was seeking treatment for mental-health issues. He is a disabled veteran and was trying to address post-traumatic stress disorder and clinical depression and he had recently been diagnosed with high-functioning autism, a condition shared by his eldest son, S.S. In response to Samuel's request, the chancellor considered and granted Samuel's motion for a continuance. In the "Order Continuing Trial," the chancellor granted Krystalynn temporary custody and awarded Samuel standard visitation pursuant to a visitation schedule. At the time, both Samuel and Krystalynn lived in Meridian. The chancellor also modified the judgment regarding the child support agreement.

3

¶6.	Around this same time, Krystalynn began dating a man from Oregon whom she met online in early 2022. Krystalynn married him in July 2022. She and the three boys moved to Oregon in September 2022.

### B.	October 18, 2022 Hearing

¶7.	By the October 2022 hearing date, Samuel had obtained legal representation. During the hearing, Krystalynn testified about the boys' schooling at the time. Krystalynn testified that she was homeschooling S.S. but acknowledged that she was not following any individualized education plan (IEP). Her homeschool regimen consisted of "hands-on learning outside," "reading books," and "watching educational television." When the boys lived in Mississippi, they were enrolled in school, and S.S. had been following an IEP correlating with his autism. Also, when Krystalynn moved the boys out of Mississippi, they became ineligible for Medicaid, which had provided for their health care in Mississippi. Krystalynn claimed, without providing evidence, that her new husband maintained all three boys on his health insurance. After hearing testimony from both Samuel and Krystalynn, the court concluded its proceedings without making any further determinations and scheduled a follow-up hearing.

¶8.	After the October hearing, on December 7, 2022, Krystalynn filed a "child molestation report" against Samuel with the Oregon Department of Human Services (DHS). The Oregon DHS conducted an investigation on the matter and ultimately held that the alleged abuse was undetermined. The Oregon DHS also referred the children to counseling.

### C.     June 13, 2023 Hearing

¶9.     At a June 2023 hearing, Samuel testified about his relationship with his sons. He stated that he kept all three boys by himself every other weekend for approximately one year after the divorce. Samuel testified that he was involved in the boys' homework and education, and he took them to church regularly. After Krystalynn obtained physical custody, Samuel continued to be involved with the boys. He still maintained regular visits with them before they moved. Samuel testified that after the move, Krystalynn started excluding Samuel from the homeschooling process and refused to update him on their sons' schooling.

¶10.     Krystalynn testified to the status of the children's schooling since the October 2022 hearing, when S.S. was the only child being homeschooled. Krystalynn explained that since the last hearing, she homeschooled the middle child, N.S., for four months and then enrolled him in public school, where he was still enrolled at that time. S.S., the eldest boy, was still being homeschooled, and Krystalynn admitted again that she was still not following an IEP or any specific curriculum. Krystalynn explained that her teaching style for S.S. was "student led." She said, because "[S.S.] is autistic, [she] has to be very fluid. He wakes up every morning in a different mood. So depending on what his mood and depending on how much he is able to mentally and emotionally take on that day will determine how much or how intensive the education is." Krystalynn said some days are very intense and they are able to accomplish a lot, but some days are more difficult, so they use those days to work on emotional and social learning. When the chancellor asked Krystalynn what her qualifications

were for homeschooling S.S., she stated that as his mother, regardless of her education, she is qualified because S.S. is her son, and she knows how to help him.

¶11.    Regarding the youngest boy, L.S., Krystalynn testified that at the time, he was not enrolled in school and was not yet enrolled in daycare, so he stayed home with Krystalynn. She explained that "pre-k starts when a child is four by August.  He just turned four on June 10th. So he would not qualify for pre-k until August."

¶12.    Krystalynn did not plead or attempt to introduce evidence related to the sexual assault charges she had reported against Samuel in Oregon. However, on cross-examination, Samuel's attorney asked Krystalynn about the sexual abuse report she filed in Oregon. The chancellor permitted her to repeat the specific allegations she had reported. The Oregon DHS report was not offered into the record by either party.

### III.    Final Judgment on Modification

¶13.    The chancery court entered its final judgment and opinion for the hearings on June 23, 2023. In its opinion, the court found that "Krystalynn has moved to Oregon which makes the weekly joint physical custody agreement unworkable, and which will require a modification." The chancery court then conducted an *Albright* analysis. On ten of the factors, the chancellor did not find one parent to prevail over the other and weighed the factors equally between both parents. The only factor he found in Krystalynn's favor was the mental health of the parents due to Samuel's PTSD and depression.  After conducting this analysis, the chancery court found

6

that the best interest of the children warrants a modification of custody with physical and legal custody being granted to Krystalynn. Samuel shall be granted visitation with the children as set out in the attached visitation schedule. The evidence was conflicting as to the parties' ability to communicate effectively. With the parties living so far apart and with Krystalynn now having physical custody, the Court finds that the children's best interest will be served by her having legal custody as well.

¶14. Regarding Samuel's visitation, the chancery court allowed Samuel to exercise visitation any weekend with advance notice and required Krystalynn to cooperate in this regard. Samuel was also granted visitation for major holidays in alternating years and most of the summer every year. Using the statutory guidelines, the chancellor ordered Samuel to pay child support, but because of Samuel's substantial travel expenses to exercise visitation in Oregon, the chancellor reduced the amount by approximately half, to $350 per month.

¶15. Samuel appealed to this Court without filing any post-trial motions.

**STANDARD OF REVIEW**

¶16. In *Culver v. Culver*, 371 So. 3d 726, 729 (¶6) (Miss. Ct. App. 2023), we reiterated the standard of review that we previously set forth in *Smith v. Smith*, 318 So. 3d 484, 490-91 (¶18) (Miss. Ct. App. 2021), for cases such as the one sub judice:

> Our standard of review for a chancery court's ruling on a motion for modification of custody "based on a material change in circumstances" is limited. *Page v. Graves*, 283 So. 3d 269, 274 (¶18) (Miss. Ct. App. 2019) (citing *Carter v. Carter*, 204 So. 3d 747, 756 (¶37) (Miss. 2016)). We will not disturb a court's findings "when supported by substantial evidence unless the [chancery court] abused [its] discretion, was manifestly wrong or clearly erroneous, or an erroneous legal standard was applied." *In re C.T.*, 228 So. 3d 311, 315 (¶6) (Miss. Ct. App. 2017) (quoting *Bowen v. Bowen*, 107 So. 3d 166, 169 (¶6) (Miss. Ct. App. 2012)). The chancery court's "interpretation and application of the law" is reviewed de novo. *Id.* (quoting *Seale v. Seale*, 150

7

So. 3d 987, 989 (¶5) (Miss. Ct. App. 2014)).

Finally, "our polestar consideration," like the chancellor's, "must be the best interest of the child." *Montgomery v. Montgomery*, 20 So. 3d 39, 42 (¶9) (Miss. Ct. App. 2009) (quoting *Hensarling v. Hensarling*, 824 So. 2d 583, 587 (¶8) (Miss. 2002)).

## DISCUSSION

¶17.    On appeal, Samuel raises multiple issues. Samuel argues that (1) the chancellor erred by finding the geographical distance between the parties and the modification of physical custody were sufficient reasons to modify joint legal custody; (2) the chancellor erred by failing to consider the totality of the circumstances in his decision to modify joint physical and legal custody ; (3) the chancellor erred in evaluating the children's best interest under the *Albright* factors; (4) the chancellor erred by not appointing a guardian ad litem sua sponte based on the formal charges of sexual abuse Krystalynn filed against Samuel; and (5) because the issue of physical custody should be reversed and remanded, so too should the issue of child support.

### I.    Geographical Distance

¶18.    Samuel argues the chancellor erred by finding that the geographical distance between the parties and the modification of physical custody arrangement were sufficient reasons to modify joint legal custody. "In modification cases, as in original awards of custody, we never depart from our polestar consideration: the best interest and welfare of the child." *Stewart v. Stewart*, 309 So. 3d [44,] 82 (¶127) (Miss. Ct. App. 2020) (quoting *Riley v. Doerner*, 677

8

So. 2d 740, 744 (Miss. 1996)). "Although Mississippi law generally has recognized that a parent's relocation alone does not constitute a material change in circumstances, we note that the impact of a relocation of the custodial parent upon the child constitutes a factor that the chancellor permissibly considers on the motion for modification." *Robinson v. Brown*, 58 So. 3d 38, 43 (¶13) (Miss. Ct. App. 2011) (citing *Lambert v. Lambert*, 872 So. 2d 679, 685 (¶24) (Miss. Ct. App. 2003)).

¶19.    In this instance, Samuel and Krystalynn had agreed to joint legal and physical custody at the time of the divorce; however, at the time of trial, "[b]oth parties acknowledge[d] that with Krystalynn moving to Oregon, the weekly exchange [was] no longer feasible." As we held in *Munday v. McLendon*, 287 So. 3d 303, 309-10 (¶26) (Miss. Ct. App. 2019), "[s]o long as there is substantial evidence in the record that, if found credible by the chancellor, would provide support for the chancellor's decision, this Court may not intercede simply to substitute our collective opinion for that of the chancellor." *Hammers v. Hammers*, 890 So. 2d 944, 950 (¶14) (Miss. Ct. App. 2004) (quoting *Bower v. Bower*, 758 So. 2d 405, 412 (¶33) (Miss. 2000)).

¶20.    While our law is clear that a custodial parent's relocation alone does not constitute a material change in circumstances, it is equally clear that the impact of the relocation upon the children and the custody arrangement are factors to be considered by the chancellor when a modification has been requested. "[E]ven a short move can result in a material change in circumstances where the move causes the custody agreement to become impractical."

9

*Munday*, 287 So. 3d at 310 (¶29). The distance moved is not "dispositive as to whether a material change in circumstances has occurred; it is the effect the move has on the child and the custody arrangement that is dispositive." *Welton v. Westmoreland*, 180 So. 3d 738, 749 (¶34) (Miss. Ct. App. 2015) (quoting *Pearson v. Pearson*, 11 So. 3d 178, 182 (¶10) (Miss. Ct. App. 2009)).

¶21.   Here, the chancellor noted in his opinion that joint custody can be modified when there is a material change of circumstances that is adverse to the children's best interest. The chancellor further stated that "[j]oint physical custody can also be modified upon a showing that the custodial arrangement is not working, and it is in the children's best interest to make the change." This Court has consistently held that modification of custody is warranted when the relocation of the parent causes the prior custody agreement to become impractical or on consideration of the effect the move has on the child. *Lambert v. Lambert*, 872 So. 2d 679, 685 (¶24) (Miss. Ct. App. 2003).

¶22.   With one parent living in Mississippi and one living in Oregon, the prior joint physical custody agreement of weekly exchanges was practically no longer possible. Further, Samuel and Krystalynn both acknowledged to the chancery court that this was no longer something that could be maintained. The chancellor recognized that the prior agreement of weekly exchanges was no longer practical and needed to be modified. Thus, we find the chancellor did not abuse his discretion in finding that a modification of physical and legal custody was warranted.

## II. Totality of the Circumstances

¶23. Samuel further argues that the chancellor erred by failing to consider the totality of the circumstances in his decision to modify joint physical and legal custody. A modification of custody is warranted when the moving parent successfully shows "(1) that a material change of circumstances has occurred in the custodial home since the most recent custody decree, (2) that the change adversely affects the child, and (3) that modification is in the best interest of the child." *Powell v. Powell*, 976 So. 2d 358, 361 (¶11) (Miss. Ct. App. 2008) (citing *Giannaris v. Giannaris*, 960 So. 2d 462, 467-68 (¶10) (Miss. 2007)).

¶24. The totality of the circumstances can serve as a basis for a material change. *See, e.g. Minter v. Minter*, 29 So. 3d 840, 850 (¶37) (Miss. Ct. App. 2009). Indeed, the chancellor must consider the totality of the circumstances when determining whether such a material change in circumstances has occurred. *Creel v. Cornacchione*, 831 So. 2d 1179, 1183 (¶15) (Miss. Ct. App. 2002). If, after examining the totality of the circumstances, a material change in circumstances in the custodial home is found to have occurred, the chancellor "must separately and affirmatively determine that this change is one which adversely affects the child[.]" *Bredemeier v. Jackson*, 689 So. 2d 770, 775 (Miss. 1997).

¶25. "In order to determine whether or not the chancellor was manifestly wrong or clearly erroneous, or abused [his] discretion in applying the *Albright* factors, we review the evidence and testimony presented at trial to ensure [his] ruling was supported by the record." *Polk v. Polk*, 332 So. 3d 348, 353 (¶16) (Miss. Ct. App. 2021) (quoting *Hollon v. Hollon*, 784 So.

11

2d 943, 947 (¶13) (Miss. 2001)).

¶26.   Samuel asserts that the chancery court "overlooked multiple important considerations." The considerations that Samuel refers to in his brief are the following: Krystalynn filed a sexual-abuse complaint against Samuel; the Oregon DHS referred the children to a behavioral-health therapist, yet Krystalynn did not take them to therapy for five months after the filing of the charges; the move to Oregon could have negative impacts on the children; Krystalynn was not using any curriculum to homeschool S.S.; Krystalynn stopped allowing Samuel to participate in the children's education and medical care even though they had joint custody at the time; and Krystalynn stopped taking N.S. to speech therapy. Samuel asserts that by not considering these factors, the chancellor did not make his custody-modification decisions based on the totality of the circumstances.

¶27.   Third, Samuel argues the move to Oregon negatively impacted the children.  In his appellate brief, Samuel states that "Krystalynn single-handedly made it impossible for the children to see their father on a regular basis.  And for no other reason than she decided to pursue a relationship with a man she met online who lived over two thousand miles away." Nothing in the record indicates that Krystalynn moved to Oregon intentionally to keep Samuel from his children or to alter their prior custody agreement. Samuel was granted a visitation schedule allowing him to exercise visitation any weekend with advance notice and required Krystalynn to cooperate in this regard.  Samuel was also granted visitation for major holidays in alternating years and most of the summer every year.  This common visitation

12

schedule for parents without sole custody of their children does not warrant disturbing the chancellor's ruling.

¶28. Samuel's last three contentions are that Krystalynn was not using any curriculum to homeschool S.S., that the chancery court should have considered that Krystalynn stopped allowing Samuel to participate in the children's education and medical care even though they had joint custody at the time, and that Krystalynn stopped taking N.S. to speech therapy. Because each of these three considerations involves the children's education and medical care, we will analyze them together.

¶29. Samuel argues that Krystalynn's decision to exclude Samuel from involvement in the children's healthcare and education violated the existing joint-custody order. The existing order required them to "share the decision-making rights, the responsibilities and authority relating to health, education and welfare of the minor children, [and] obligates each party to exchange information concerning the health, education and welfare of the minor children, and . . . confer with the other in the exercise of decision-making rights, responsibilities and authority." However, they agreed that if a disagreement arose, Krystalynn would be given the final say "regarding the minor children's education and medical," and Samuel would have the final say "as to the general welfare and extracurricular/recreational decisions of the [children]."

¶30. Again, these final three suggested considerations all regard the education and medical care of the children. Samuel and Krystalynn were in dispute over the education and medical

13

care of the boys. Krystalynn believed she knew what homeschool curriculum was best suited for S.S. while navigating his autism, but Samuel disagreed. Krystalynn believed that N.S. no longer needed speech therapy, and Samuel disagreed with this as well. Because these disagreements fall under education and medical care, Krystalynn's decision to not use a curriculum while homeschooling S.S. and her decision to stop taking N.S. to speech therapy were consistent with her prerogative under the custody agreement.

### III.     *Albright* Analysis

¶31.    Samuel's next argument is that the chancellor erred in evaluating the children's best interests under the *Albright* factors.  Samuel argues that the chancery court erred in basing its decision on a singular *Albright* factor that deals with the mental health of the parents. Further, Samuel argues that the chancery court's entire *Albright* analysis was flawed because it overlooked some important considerations.  After reviewing the factors and evidence that the chancellor relied on, we affirm the chancellor's holding.

¶32.    "[T]he polestar consideration in child custody cases is the best interest and welfare of the child." *Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983). To make this determination, chancellors must evaluate the following factors:

> (1) the child's age, health, and sex; (2) the parent with the continuity of care prior to the separation; (3) the parent with the best parenting skills and the willingness and capacity to provide primary child care; (4) the parents' employment and the responsibilities of that employment; (5) the parents' physical and mental health and age; (6) the emotional ties of the parent and child; (7) the parents' moral fitness; (8) the child's home, school, and community record; (9) the child's preference at the age sufficient to express a preference by law; (10) the stability of the parents' home environments and

14

employment; and (11) other factors relevant to the parent-child relationship. *Latham*, 357 So. 3d at 1161 (¶8). Although "[a]n *Albright* analysis is not a mathematical equation," and "all the *Albright* factors are important, the chancellor has the ultimate discretion to weigh the evidence the way he sees fit." *Latham v. Latham*, 357 So. 3d 1157, 1161 (¶9) (Miss. Ct. App. 2023) (quoting *Hall v. Hall*, 134 So. 3d 822, 827 (¶19) (Miss. Ct. App. 2014)). "Further, the factors are not meant to be weighed equally in every case." *Polk*, 332 So. 3d at 353 (¶16) (citing *Divers v. Divers*, 856 So. 2d 370, 376 (¶27) (Miss. Ct. App. 2003)). However, "[a] chancellor is required to make findings of fact with regard to each *Albright* factor." Deborah H. Bell, *Bell on Mississippi Family Law* § 12.03[1], at 383 (3d ed. 2020). "Failure to make the required findings is one of the most common reasons for reversal of a custody award." *Id*. "[A] determination of child custody will be held erroneous where a chancellor is not thorough in his discussion" of the *Albright* factors. *Robles v. Gonzalez*, 246 So. 3d 945, 950 (¶21) (Miss. Ct. App. 2018) (quoting *Powell v. Ayars*, 792 So. 2d 240, 249 (¶33) (Miss. 2001)). "In order to determine whether or not the chancellor was manifestly wrong or clearly erroneous, or abused [his] discretion in applying the *Albright* factors, we review the evidence and testimony presented at trial to ensure [his] ruling was supported by the record." *Polk*, 332 So. 3d at 353 (¶16) (quoting *Hollon*, 784 So. 2d at 947 (¶13)).

¶33. On appeal, Samuel argues that the overall *Albright* analysis was flawed but focuses his argument on the idea that the chancellor relied on a sole factor in making his ruling.

15

¶34. Under factor one, the age, health, and sex of the children, the court stated in its opinion, "The children are boys, ages nine, five and three. One child has had to take speech therapy and one has autism. In all other respects they seem to be well physically and mentally." Samuel argues that the chancellor should have considered the recommendation from the Oregon DHS that the children go to behavioral-health therapy. Because the DHS report was not presented as evidence before the chancellor, this argument is barred on appeal. The chancellor did not err in weighing this factor equally between the parents.

¶35. The second factor evaluates which parent had continuing care of the child prior to separation. The court found that "[t]he parties shared in their parenting prior to their separation and after their divorce. Both parents were actively involved in the day-to-day care of the boys." Samuel states in his appellate brief that he "agrees with the chancellor's analysis of this factor."

¶36. For the next factor, parenting skills and the willingness to provide primary care, the chancellor found that "[t]he evidence presented was disputed in some regards, but overall both parents exhibit basic parenting skills. Both express a willingness to take on full-time parenting. Both parents appear to be able to provide for the normal and extra normal needs of the boys." Samuel argues that the chancellor failed to consider that Krystalynn filed a sexual abuse complaint and the turmoil Krystalynn inflicted on the children by unilaterally deciding to move over two thousand miles away to Oregon. His next assertion under this factor is that the chancellor erred by not considering that Krystalynn, after moving to Oregon,

16

stopped allowing Samuel to participate in the children's schooling and healthcare decisions and denied him access to information on these topics even though he shared joint legal custody with her. Samuel's last assertion under this factor is that "the chancellor erred by failing to consider the huge red-flags displayed by Krystalynn's refusal to educate the children properly or have them in needed therapy." Each of these suggested considerations has been addressed above, and we decline to address them again here. Ultimately, the chancellor did not abuse his discretion.

¶37. The fourth factor, employment responsibilities of the parents, did not favor one parent over the other. The chancellor found that "Krystalynn is a stay-at-home Mom who is homeschooling the children. Her current spouse provides sufficient income to allow her the ability to stay at home with the children. Samuel states that he would be able to handle the responsibility of full custody and stated he would also home school the children." Samuel agrees with the chancellor's decision on this factor.

¶38. Samuel argues the chancellor gave undue weight to the fifth factor, the physical health, mental health, and age of the parties, because it is the only one the chancellor found to favor one parent over the other. The chancellor stated that "[t]he age of the parties is not significant to custody. Krystalynn appears to be in good physical and mental health. Samuel stated that he had been diagnosed with severe clinical depression and PTSD. He acknowledged that he has episodes. During a previous court hearing, he stated he was having depression issues, which caused a continuance to be granted at his request. This factor favors

17

Krystalynn." Samuel cites *Borden v. Borden*, 167 So. 3d 238 (Miss. 2014), to support his conclusion that the chancellor erred by relying on this single factor to reach the decision on custody modification. However, Samuel's reliance on *Borden* is misplaced. In *Borden*, our supreme court found that a chancellor erred in giving undue weight to one party's conduct. *Id.* at 243 (¶10). In that case, the chancellor found that three separate *Albright* factors favored the father. In part, the chancellor found that the mother's inappropriate extramarital contacts and sexual communications reflected poorly on her moral fitness. *Id.* Our supreme court found that the chancellor erred by giving undue weight to this conduct when the chancellor also found that this same behavior weighed against the mother in two additional factors, parenting skills and stable home environment. *Id.*; *see also Brekeen v. Brekeen*, 880 So. 2d 280, 287 (¶21) (Miss. 2004) (chancellor erred by weighing mother's affair against her in multiple factors).

¶39.    A more relevant case on this particular issue is *O'Briant v. O'Briant*, 99 So. 3d 802 (Miss. Ct. App. 2012). In *O'Briant*, the father "suggest[ed] the chancellor put too much weight on the three months he was committed to the Mississippi State Hospital at Whitfield in 2000." *Id.* at 806 (¶18). We stated that "[t]hese challenges are premised on the chancellor's evidentiary and credibility assessments." *Id.* This Court explained:

> In our narrow review we give deference to the chancellor's factual findings, asking if they were supported by substantial evidence. *See, e.g., Wilson v. Wilson*, 53 So. 3d 865, 867-68 (¶¶7, 10) (Miss. Ct. App. 2011). "The credibility of the witnesses and the weight of their testimony, as well as the interpretation of evidence where it is capable of more than one reasonable interpretation, are primarily for the chancellor as the trier of facts." *Johnson*

18

*v. Gray*, 859 So. 2d 1006, 1014 (¶36) (Miss. 2003) (quoting *Chamblee v. Chamblee*, 637 So. 2d 850, 860 (Miss. 1994)). "'[T]he chancellor has the ultimate discretion to weigh the evidence the way she sees fit' in determining where the child's best interest lies." *Blakely*[*v. Blakely*], 88 So. 3d [798,] 803 (¶17) [(Miss. Ct. App. 2012)] (quoting *Johnson*, 859 So.2d at 1013-14 (¶36)).

*Id.* at 806 (¶19). Accordingly, we concluded that "[b]ecause the chancellor relied on [the father's] psychiatric records as well as his own testimony about his continued treatment to make her findings, we find no abuse of discretion in finding the physical-and-mental-health-of-the-parents factor 'slightly' favored [the mother]." *Id.* at 807 (¶21). Further, it has been held that with such assessments as the one in *O'Briant* this Court should give deference to the chancellor because it is he who "hear[d] the evidence first-hand and is afforded the best opportunity to make assessments regarding the credibility of the various witnesses and to decide what weight to give particular portions of the evidence." *Hoggatt v. Hoggatt*, 796 So. 2d 273, 274 (¶3) (Miss. Ct. App. 2001).

¶40.    Here, the chancellor conducted a full analysis of each *Albright* factor. For ten of the factors, the chancellor found that neither parent prevailed over the other, and, therefore, was not favored over the other parent in regard to that factor.

¶41.    The only factor favoring Krystalynn is factor five, the physical health, mental health, and age of the parties. The chancellor mentioned in the *Albright* analysis that Samuel had "severe clinical depression and PTSD" and that Samuel "acknowledged that he has episodes." Samuel argues that "[t]here's no evidence [his] mental health affected his ability to parent" and asserts that "this factor should not have been anywhere close to dispositive on

19

the custody decision." However, the chancellor had the opportunity to hear from Samuel on three separate occasions over a fourteen-month period. The chancellor initially granted Samuel's request to temporarily give up his custodial rights due to his mental health challenges. The chancery court was never presented with additional evidence that Samuel's mental health had improved. As in *O'Briant*, the chancellor was given evidence to support his findings that this factor weighed in favor of Krystalynn over Samuel. Thus, the chancellor did not err in his analysis of this factor.

¶42. For factor six, the emotional ties of the parent to the children, the chancellor found "that there was a close parent-child bond and emotional tie between the children and both parents." Samuel agrees with the chancellor's analysis of this factor.

¶43. Under the next factor, moral fitness, the chancellor stated, "No evidence was presented by either party that moral fitness was an issue in this case." Samuel argues that "[t]his is another factor where the chancellor should have weighed against Krystalynn her filing of a sexual-abuse complaint against Samuel . . . ." The chancellor did not specifically address the complaint Krystalynn filed against Samuel in Oregon.

¶44. Factor eight looks at the home, school, and community record of the children. The chancellor found that "[n]othing in the record favors one over the other." Samuel argues the chancellor erred by "ignor[ing] that Krystalynn failed to adequately educate the nine-year-old autistic child over an extended period of time." As explained earlier in this opinion, Krystalynn had the final say in the children's education when Samuel and Krystalynn

disagreed on that matter. Further, Samuel did not provide any evidence to show that the education S.S. was receiving was "inadequate"; he merely argued that Krystalynn was not following a set curriculum. Thus, the chancellor did not err in his analysis of this factor.

¶45. Under factor nine, the preference of the children, the chancellor found that the children were too young to express a custody preference, being ages four, seven, and nine at the time of this analysis. Samuel agrees with this finding.

¶46. For factor ten, the stability of the home environment and employment of each parent, the chancellor stated, "Both parents' home environment appear to be stable. Krystalynn has no personal income as a stay-at-home Mom. Samuel receives VA Disability income and rental income from a home in Hawaii. He has been involved in the stock market and his present financial difficulties stem from losses therein." Samuel argues that the chancellor erred by ignoring that Krystalynn created instability by unilaterally deciding to move to Oregon," that the chancellor erred by "ignoring the deficient education Krystalynn was giving the autistic child" after moving, that the chancellor should have considered that Krystalynn unilaterally stopped the middle child's speech therapy," and that the chancellor "should have considered that Krystalynn did not send the children to the behavioral-health therapy for five months, despite it being recommended by Oregon DHS." We addressed these considerations in Part II of this opinion and restate that the chancellor did not err in his analysis of this factor.

¶47. Factor eleven concerns any additional relevant factors that may not have been

21

previously mentioned. The chancellor did not include any other factors that he believed were relevant. Samuel repeats his argument that the chancellor erred by not weighing Krystalynn's filing of the abuse claim against her.

¶48. We disagree with Samuel's argument that the chancellor gave undue weight to one *Albright* factor in granting Krystalynn custody. The chancellor analyzed each factor and ultimately concluded that all the factors were neutral except one, which favored Krystalynn. We also find that the chancellor did not reversibly err in his overall analysis of the other factors. Thus, we affirm the chancery court's decision.

## IV. Guardian Ad Litem

¶49. Samuel argues for the first time on appeal that the trial court committed reversible error by failing to sua sponte appoint a guardian ad litem (GAL). He argues that his cross-examination of Krystalynn at trial—eliciting details of the DHS report she filed against him in Oregon—triggered mandatory appointment of a GAL under Mississippi Code Annotated section 93-5-23 (Rev. 2021).[2] Neither party requested that a GAL be appointed.[3]

---

[2] The statute provides that "[t]he [chancery] court may investigate, hear and make a determination in a custody action when a charge of abuse and/or neglect arises in the course of a custody action" and "in such cases the court shall appoint a guardian ad litem for the child." Miss. Code Ann. § 93-5-23. The chancery court "is provided discretion to determine if issues of abuse or neglect have sufficient factual basis to support the appointment of a guardian ad litem." *Carter v. Carter*, 204 So. 3d 747, 759 (¶51) (Miss. 2016).

[3] Krystalynn did not raise any allegations of abuse against Samuel in her pleadings or direct testimony. On appeal, we have an open motion from Samuel asking this Court to take judicial notice of the Oregon DHS report. The motion states that "[t]he report was never introduced at trial, but it should have been." The motion further asserts that "by not mentioning the abuse allegations, and by awarding Samuel substantial visitation rights, the

22

¶50. The Mississippi Supreme Court directly addressed the question of whether a chancellor should have sua sponte appointed a guardian ad litem in *Carter v. Carter*, 204 So. 3d 747, 759 (¶50) (Miss. 2016). In *Carter*, a mother argued for the first time in an amended motion for a new trial that the chancellor had erred by failing to sua sponte appoint a guardian ad litem after the father raised allegations of neglect of the child during trial. *Id.* at 751 (¶12). After determining that the issue had been preserved for appeal, the Court decided that the allegations raised during trial did not trigger a mandatory GAL appointment.[4]

¶51. "[I]f an appellant raises for review an issue not raised in the pleadings, transcript, or rulings, the appellant must have preserved the issue by raising it in a motion for [a] new trial." *Page v. State*, 64 So. 3d 482, 489 (¶29) (Miss. 2011) (quoting *Collins v. State*, 594 So. 2d 29, 36 (Miss. 1992)). A review of similar cases analyzing whether a GAL appointment was mandatory shows that in those cases, the issue was preserved for appeal at trial. *See Monk v. Fountain*, 296 So. 3d 761, 765 (¶17) (Miss. Ct. App. 2020) (finding chancellor was within discretion in determining that a factual basis was not present to require appointment

---

chancellor implicitly found that the allegations were false and that Samuel had not committed any wrongdoing." After careful consideration, we deny the motion to take judicial notice. The report was not admitted as evidence before the chancellor and does not fall within the purview of Mississippi Rule of Evidence 201. *See Thompson v. Jones*, 17 So. 3d 524, 528 (¶17) (Miss. 2008). Arguments directly related to the report are therefore procedurally barred.

[4] The Court held that "judges in their discretion [are allowed] to consider new grounds raised in amendments to timely filed Rule 59 motions for [a] new trial." *Id.* And therefore the "issue of whether the appointment of a guardian ad litem was mandatory is properly before this Court." *Id.* at 754 (¶30).

23

of a GAL); *Savell v. Manning*, 325 So. 3d 1208, 1213 (¶3) (Miss. Ct. App. 2021) (finding the trial court did not err in denying a party's request to appoint a guardian ad litem).

¶52. Here, unlike the party in *Carter*, Samuel did not file a post-trial motion invoking section 93-5-23. Therefore, because this issue is not properly before us, we decline to consider it.[5]

¶53. Because this issue is procedurally barred, we do not decide the merits of whether the chancellor should have sua sponte appointed a guardian ad litem in this scenario. It is worth recognizing that chancellors facing this scenario navigate a statute that provides both discretion and a mandate. Section 93-5-23 provides in relevant part:

> The [chancery] court may investigate, hear and make a determination in a custody action when a charge of abuse and/or neglect arises in the course of a custody action as provided in Section 43-21-151,[6] and in such cases the court shall appoint a guardian ad litem for the child . . . .

Additionally, when "a party alleges that the child whose custody is at issue has been the victim of sexual or physical abuse by the other party, the court may, on its own motion, grant

---

[5] The *Carter* opinion treated the section 93-5-23 issue as subject to waiver and did not review the chancellor's failure to sua sponte appoint a guardian ad litem for plain error.

[6] Mississippi Code Annotated section 43-21-151(Rev. 2023) provides in relevant part:

> When a charge of abuse or neglect of a child first arises in the course of a custody action between the parents of the child already pending in the chancery court and no notice of such abuse was provided prior to such chancery proceedings, the chancery court may proceed with the investigation, hearing and determination of such abuse or neglect charge as a part of its hearing and determination of the custody issue as between the parents.

a continuance . . . until such allegation has been investigated by the Department of Child Protection Services . . . . [T]he court may direct the party and his attorney making such allegation of child abuse to report in writing to" DHS. *Id.*

¶54. The chancery court "is provided discretion to determine if issues of abuse or neglect have sufficient factual basis to support the appointment of a guardian ad litem." *Carter v. Carter*, 204 So. 3d 747, 759 (Miss. 2016). The statute "appears in all events to afford the chancellor some discretion in determining whether there is a legitimate issue of neglect or abuse *even* in those situations where one party elects to make such an assertion in the pleadings, since the statute uses the permissive 'may' in authorizing the chancellor to invoke the investigatory arm of the Department of Human Services to look into the truth of the assertions." *Johnson v. Johnson*, 872 So. 2d 92, 94 (¶8) (Miss. 2004) (emphasis added).

¶55. This Court has deferred to a chancellor's decision not to appoint a GAL when the allegation of abuse was first raised during trial testimony. *See Monk*, 296 So. 3d at 766 (¶22); *Savell*, 325 So. 3d at 1218 (¶34). At the same time, however, "[w]hen a chancellor chooses to hear the abuse allegation during a custody hearing, appointment of a GAL is mandatory." *Smith v. Smith*, 206 So. 3d 502, 510 (¶14) (Miss. 2016).[7] "In these situations the

---

[7] In *Smith*, a mother accused the father of molesting the children, resulting in a DHS investigation. *Id.* at 507 (¶2). After an investigation, the authorities declined to bring criminal charges or a youth-court action against the father. *Id.* However, during divorce and custody proceedings, the mother continued to claim that the father was committing sexual abuse and presented supporting testimony from four witnesses. *Id.* at 508 (¶8). As a result, the chancellor appointed a GAL. *Id.*

chancellor is required to appoint a guardian ad litem, whether the parties requested a guardian ad litem or not." *Carter*, 204 So. 3d at 759 (¶50).[8] Ultimately, of paramount concern is the best interest and safety of the child. Our statutory schemes and caselaw recognize that our chancellors must navigate these concerns on a case-by-case basis, relying often on their discretionary determinations of credibility.

## V.    Child Support

¶56.    Lastly, Samuel asserts that because the issue of physical custody should be reversed and remanded, the issue of child support should be reversed and remanded as well. On appeal, we do not find that the ruling on physical custody should be reversed; therefore, we decline to address the argument of reversing the judgment on the matter of child support.

## CONCLUSION

¶57.    After a review of the record, this Court finds that the chancery court did not reversibly err in its modification of physical and legal custody. "[T]he chancellor has the ultimate discretion to weigh the evidence the way he sees fit." *Latham*, 357 So. 3d at 1161 (¶9) (quoting *Hall*, 134 So. 3d at 827 (¶19)). Accordingly, we affirm the chancery court's final judgment and opinion.

¶58.    **AFFIRMED.**

---

[8] The scenario before us is unusual in that Samuel, not Krystalynn, is the only party both at trial and on appeal bringing attention to the allegations Krystalynn brought against Samuel in Oregon. Krystalynn framed her cross-examination testimony as "what was reported" in Oregon, and did not renew or initiate allegations of abuse against Samuel in these proceedings or any other proceeding in Mississippi.

26

**BARNES, C.J., McDONALD, LAWRENCE, McCARTY, WEDDLE AND ST. PÉ, JJ., CONCUR. WILSON, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY CARLTON, P.J., AND EMFINGER, J.**

**WILSON, P.J., DISSENTING:**

¶59. I would reverse the judgment because the chancellor did not appoint a guardian ad litem (GAL) to investigate a charge of sexual abuse, as required by Mississippi Code Annotated section 93-5-23 (Rev. 2021). In addition, the chancellor's opinion on custody and visitation fails to mention or address the charge of sexual abuse. Finally, it is impossible to say whether the chancellor's decision serves the children's best interests because the record discloses only the barest details regarding Krystalynn's new home and living situation in Oregon and *no evidence* regarding her new husband, who will be living with and helping parent the children. The chancellor's opinion likewise fails to mention or address Krystalynn's remarriage and new husband. For these reasons, I respectfully dissent.

¶60. "In child-custody cases where abuse and/or neglect are raised, the chancellor's decision to appoint a [GAL] may be mandatory or discretionary." *Carter v. Carter*, 204 So. 3d 747, 758-59 (¶50) (Miss. 2016). "The appointment is mandatory where the allegations of abuse and/or neglect rise to the level of a 'charge of abuse and/or neglect,' and in those cases 'the court shall appoint a [GAL] for the child as provided under [Mississippi Code Annotated] Section 43-21-121, who shall be an attorney.'" *Id.* at 759 (¶50) (quoting Miss. Code Ann. § 93-5-23). "In these situations the chancellor is required to appoint a [GAL], *whether the parties requested a [GAL] or not*." *Id.* (emphasis added).

27

¶61.   "However, under Mississippi Code Section 93-5-23, the chancellor is provided discretion to determine if issues of abuse or neglect have sufficient factual basis to support the appointment of a [GAL]." *Id.* at (¶51).  The statute gives "the chancellor some discretion in determining whether there is a legitimate issue of neglect or abuse even in those situations where one party elects to make such an assertion in the pleadings." *Id.* (quoting *Johnson v. Johnson*, 872 So. 2d 92, 94 (¶8) (Miss. Ct. App. 2004)).  The chancellor is not required to appoint a GAL "based merely on an unsubstantiated assertion found in the pleadings of one of the parties." *Id.* at (¶52) (quoting *Johnson*, 872 So. 2d at 94 (¶8)).

¶62.   In this case, Krystalynn testified that in December 2022, the parties' three-year-old son L.S. "asked [her] to taste his penis."  She testified that she "asked [L.S.] to repeat what he said and he said he asked me to taste his penis."  Krystalynn asked L.S., "Where did you hear that?  Who does that?  Who said that?"  According to Krystalynn, L.S. "said, 'Daddy,' and then he went on to explain that while they were in the shower daddy tasted his penis and he got in trouble because a little bit of pee came out while daddy was tasting his penis." Krystalynn testified that L.S. "repeated the same thing" to her new husband and to a social worker from the Oregon Department of Human Services (DHS).  Krystalynn stated that the Oregon DHS "deemed" the allegation "undetermined" because L.S. did not repeat the allegation and "didn't talk much at all during [a subsequent] forensic interview."  Krystalynn testified that L.S.'s statements to her occurred on December 7, 2022, shortly after the children returned from visiting Samuel at Thanksgiving.

¶63. Krystalynn's charge of abuse was not a mere "assertion in the pleadings." *Johnson*, 872 So. 2d at 94 (¶8). Rather, Krystalynn testified under oath to a serious charge of sexual abuse against three-year-old L.S. Because it is clear that "a charge of abuse" arose in this custody action, the chancellor was *required* to appoint a GAL to investigate the charge and to protect the interests of the children. Miss. Code Ann. § 93-5-23. In this situation, the appointment of a GAL is "mandatory." *Carter*, 204 So. 3d at 759 (¶50).

¶64. Despite this serious charge of sexual abuse, the chancellor failed to appoint a GAL and did not even *mention* the issue in his opinion on custody and visitation. This issue must be addressed in some fashion. If there is merit to the charge, then Samuel should not be exercising unsupervised visitation with these three young children. Alternatively, if there is evidence that Krystalynn fabricated the charge or coached L.S., then the chancellor should weigh that evidence in his custody determination. Either way, a serious charge of sexual abuse that arises in a child custody dispute should not be ignored altogether. A chancellor cannot leave such a serious charge unmentioned while granting unsupervised visitation to the alleged perpetrator. Under section 93-5-23 and Supreme Court precedent, we are bound to reverse and remand for a GAL to be appointed to investigate this charge.

¶65. The majority opinion "decline[s] to consider" this issue because Samuel failed to raise it in the trial court. *Ante* at ¶52. The majority invokes this supposed procedural bar sua sponte, as Krystalynn herself does *not* argue that the issue is waived or procedurally barred. This is contrary to the principle that "[a] party can waive a waiver argument by not making

29

the argument below or in its briefs." *Williams v. State*, 334 So. 3d 177, 183 (¶19) (Miss. Ct. App. 2022) (quoting *Mayton v. Oliver*, 247 So. 3d 312, 321 (¶31) (Miss. Ct. App. 2017)). It is also contrary to the rule that "we will not act as an advocate for one party to an appeal" by raising issues or making arguments that the parties themselves have not. *Rosenfelt v. Miss. Dev. Auth.*, 262 So. 3d 511, 519 (¶27) (Miss. 2018).

¶66.    More important, though, "[t]he mandatory appointment of a GAL in cases of abuse or neglect *is to protect the child, not the parties*." *Monk v. Fountain*, 296 So. 3d 761, 765 (¶17) (Miss. Ct. App. 2020) (emphasis added). "Therefore, if there is a 'sufficient factual basis to support' a 'legitimate' claim of abuse or neglect, 'the chancellor is required to appoint a [GAL], *whether the parties requested a [GAL] or not.*'" *Id.* (quoting *Carter*, 204 So. 3d at 759 (¶¶50-51)) (addressing the issue despite the appellant's failure to set her motion for a GAL for a hearing or obtain a ruling on the motion).[9]

¶67.    While the failure to appoint a GAL requires reversal, the lack of evidence regarding Krystalynn's new husband and new living situation in Oregon is also a cause for concern. Krystalynn met her new husband online sometime in 2022. She testified that they became "intimate" in April 2022, married in July 2022, and in September 2022, she and the parties' three children moved cross-country to Oregon. The record does not even disclose

---

[9] Despite "declin[ing] to consider" the issue, the majority opinion goes on to engage in an extended discussion of the chancellor's "discretion" to determine whether a GAL must be appointed in a particular case. *Ante* at ¶¶52-55. This discussion is beside the point here because nothing in the record suggests that the chancellor in this case made a discretionary decision. The chancellor never considered the issue on the record.

Krystalynn's new husband's *name*, although a text message admitted into evidence seems to refer to him as "Todd," and Krystalynn was referred to as Krystalynn Ferguson on the last day of trial.[10] We know nothing else about Krystalynn's new husband. He did not testify at trial, nor did Krystalynn say much about him. We do not know what kind of stepparent he is, if he has any children of his own, or if there is anything about him or his background that might be a cause of concern or otherwise relevant to the best interests of S.S., N.S., and L.S. In October 2022, Krystalynn notified the chancery court of her new address in "Good River, OR," although she likely meant Hood River. Krystalynn testified that she, her husband, and her three children were living in an apartment, but she provided no other information about the apartment, nor did she say whether anyone else lived with them.

¶68. Although the litigants, not the court, are responsible for presenting evidence,[11] the chancery court has a special responsibility when it comes to the custody and welfare of children. The Mississippi Supreme Court has stated that "[b]y our Constitution and ancient law, a court of equity is the superior guardian for all persons under a disability, and under a duty to make a searching inquiry on matters affecting their welfare." *In re Adoption of a Minor*, 558 So. 2d 854, 857 (Miss. 1990). Indeed, "[a] fundamental purpose and major

---

[10] The Oregon DHS report that the Court declines to consider, *see ante* at n.3, identifies Krystalynn's new husband as both "Todd Vergori" and "Todd Ferguson."

[11] *See Dunaway v. Dunaway*, 749 So. 2d 1112, 1121 (¶28) (Miss. Ct. App. 1999) ("To the extent that the evidence on which the chancellor based his opinion was less informative than it could have been, we lay that at the feet of the litigants and not the chancellor.").

reason for the existence of a chancery court is to fulfill society's function of protecting children." *Id.* (quoting *Miss. State Bar Ass'n v. Moyo*, 525 So. 2d 1289, 1295 (Miss. 1988)). Therefore, "in weighing a custody change," "a chancellor is never obliged to ignore a child's best interest . . . ; in fact, a chancellor is bound to consider the child's best interest above all else." *Riley v. Doerner*, 677 So. 2d 740, 744 (Miss. 1996). "Above all, in modification cases, as in original awards of custody, we never depart from our polestar consideration: the best interest and welfare of the child." *Id.* (quotation marks omitted). "As such, chancellors should consider any and all evidence which aids them in reaching the ultimate custody decision." *Murphy v. Murphy*, 631 So. 2d 812, 816 (Miss. 1994). "How much more important, when not simply some property interest, but the entire future of a child is involved that the chancellor proceed deliberately *and only after assuring himself that all facts needed for the child's best interest are brought to his attention*." *In re Adoption of a Minor*, 558 So. 2d at 857 (emphasis added).[12]

¶69. In this case, the chancellor granted custody to Krystalynn while knowing only the barest details regarding her new home and living situation in Oregon and knowing nothing about the identity and character of her new husband—the children's new stepfather—who will be living with them in Oregon. Indeed, the chancellor's final opinion and judgment do not even *mention* Krystalynn's remarriage or her new husband. In addition, as discussed

---

[12] For the same reason, "where child custody is at issue," this Court "is compelled to review the record, despite [the appellee's] failure to file a brief." *Muhammad v. Muhammad*, 622 So. 2d 1239, 1243 (Miss. 1993).

above, the chancellor did not appoint a GAL in violation of section 93-5-23 and did not address the serious charge of sexual abuse leveled during this custody proceeding. I would reverse and remand for the appointment of a GAL and additional proceedings to address these gaps in the record. Accordingly, I respectfully dissent.

**CARLTON, P.J., AND EMFINGER, J., JOIN THIS OPINION.**